Filed 5/22/13  P. v. Parker CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LESLIE GENE PARKER,<br><br>    Defendant and Appellant. | E054825<br><br>(Super.Ct.No. RIF136528)<br><br>**OPINION** |

APPEAL from the Superior Court of Riverside County.  Helios (Joe) Hernandez, Judge.  Affirmed.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and James Dutton and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

In 1985, a team of robbers stole $265,000 from a Riverside bank.  One of the robbers got into a shootout with a security guard.  The security guard was shot and died; the robber was shot and bleeding but managed to flee.  In 2007, DNA testing matched the robber's blood to defendant Leslie Gene Parker.

1

Defendant was charged with murder (Pen. Code, § 187, subd. (a)), with a robbery-murder special circumstance (Pen. Code, § 190.2, subd. (a)(17)), a personal firearm use enhancement (Pen. Code, § 12022.5, subd. (a)), and a prior serious felony conviction enhancement (Pen. Code, § 667, subd. (a)).

In the guilt phase, the jury found defendant guilty of first degree murder (Pen. Code, § 189) and found all the charged allegations true.

In the penalty phase, the jury was unable to reach a verdict. The People elected not to retry the penalty phase. Accordingly, defendant was sentenced to an indeterminate term of life without the possibility of parole, a determinate term of seven years, and the usual fines and fees.

Defendant now contends:

1. The trial court erred by admitting evidence that defendant had committed a previous robbery.

2. The trial court violated the confrontation clause by allowing a pathologist who was not present at the victim's autopsy to testify regarding the autopsy report.

We find no prejudicial error. Hence, we will affirm.

I

FACTUAL BACKGROUND

The First Interstate Bank branch at Tyler Mall maintained an automated teller machine (ATM) at the entrance to the mall. There was a night drop behind the ATM, where merchants could deposit their receipts.

Normally, Brinks Security was responsible for picking up the deposits and transporting them to the bank, about 100 yards away. As of December 1985, however, Brinks employees were on strike. The bank therefore retained an armed security guard — Fred Taylor, a retired police officer.

On December 16, 1985, around 9:00 a.m., Taylor and two bank employees — Robert Steve Parker[1] and Donna Coffee — drove over to the ATM to pick up the deposits and take them back to the bank.

As they got back to their cars with the deposits, a man holding a gun approached them and yelled something. Both Taylor and the gunman started shooting. When the shooting stopped, a second man, holding a knife, walked up to the cars and took the money. The robbers got into a white or silver Datsun or Toyota and drove away. They netted approximately $265,000.

According to Dr. Joseph Cohen — an expert pathologist, who did not perform the autopsy but did review the autopsy report — Taylor was hit by two bullets and died as a result.

On the way to the hospital, Taylor told paramedics that there were two robbers and that he shot one of them.

Parker described the gunman[2] as a White male in his early 20's, about five feet ten inches tall, slender, with dark brown hair and a moustache. The gunman was wearing a

---

[1]    No relation to defendant.

[2]    See appendix A, *post*, pages 19 through 21, a chart summarizing all the descriptions of the robbers.

blue plaid shirt, and he had a pock-marked face. Parker told police that the gunman got into the driver's side.

Parker described the second man as a White male in his 20's, five feet ten inches tall, and slender. He was wearing a gray hoodie. He did not appear to be injured.

Coffee described the gunman as a White male, about 28 years old, five feet ten inches to six feet tall, with brown hair and a moustache, wearing a blue plaid shirt. He had "possible" pock marks, pimples, or acne on his face. She believed the gunman got into the driver's side.

Using an "Identi-Kit," Coffee produced a sketch of the gunman. The sketch has not been transmitted to this court, but defendant concedes that it "resembled" him.

According to eyewitness Lee Ann Salmon, the gunman's left leg was injured; he was limping. She described him as in his 20's, five feet eight inches tall, with black hair and no facial hair. He was wearing a blue plaid flannel shirt.

Eyewitness Craig Liddicote agreed that the gunman was shot in the leg. Liddicote described both robbers as White males between five feet ten inches and six feet tall. One of them may have had a mustache. Also, one of them was wearing a red hoodie.

Eyewitness Theodore Willis testified that the gunman was hit in the leg and the arm. According to Willis, the gunman got into the passenger side of the car.

Eyewitness Terry Williams saw only the driver of the car; she told the police that he was wearing a red hoodie.

4

A trail of blood drops led from the shooting scene to the getaway car. They were Type A. Taylor's blood was Type O. There were no blood drops by the cars, where the second man took the money.

Coffee wrote down the license number of the getaway car. What she wrote was "975 XRW." At the time, however, she told police that she might be off by one letter or one number.

Sometime between 8:00 and 10:15 a.m., a silver Datsun B210 with license number "975 XRF" was left in a parking lot two blocks away from the mall. It had recently been stolen. There was blood on the passenger seat, as well as both inside and outside the passenger side door. The blood on the passenger seat was Type A.

In 1986, the case was suspended due to lack of leads. In 2004, the case was reopened, and the blood on the passenger seat was DNA profiled. In 2007, the DNA from the blood on the passenger seat was found to match defendant's DNA.

Defendant had scars on his left leg and left arm. He told his ex-wife that he got them when he rolled over in a forklift at work. However, he told his girlfriend that he got them from hopping over a barbed-wire fence. When the police interviewed him, he told them he had injured his leg in a motorcycle accident. X-rays showed a bullet in defendant's left arm and another bullet, along with metallic fragments, in his left leg.

On the date of the crime, defendant was 26 years old. He had brown hair. He was six feet two inches tall, with a large build.

According to a dermatologist, defendant's face was not pock-marked, and he showed no signs of any cosmetic procedure to remove pock marks.

5

According to an expert on eyewitness identifications, if two eyewitnesses independently remembered a man as having a pock-marked face, it was extremely likely that their memory was accurate. Likewise, if three witnesses independently remembered a man wearing a red shirt, it was extremely likely that there really was a man wearing a red shirt.

## II

## EVIDENCE THAT DEFENDANT HAD COMMITTED A PRIOR ROBBERY

Defendant contends that the trial court erred by admitting evidence that he had committed an earlier robbery in 1978 as evidence of the intent to rob.

A.      *Additional Procedural Background.*

Before trial, defendant filed a motion in limine to exclude any evidence that he had committed an armed robbery of a gas station in 1978. He argued that the prior robbery was not admissible to show identity. However, he did not address whether it was admissible to show intent.

Simultaneously, the prosecution filed a motion in limine to admit this evidence. It argued that the evidence was relevant to intent and was more probative than prejudicial.

At a hearing on the motions, defense counsel argued that the evidence of intent to rob was already strong so that the prior robbery "doesn't really add anything . . . ." He also argued that the two robberies were not similar, and the prior robbery would be prejudicial.

The trial court ruled, "I'm going to let it in. I don't think it's cumulative.

At the end of the trial, the trial court instructed:

6

"The People presented evidence that the defendant committed another offense of robbery that was not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offense. . . . If the People have not met this burden, you must disregard this evidence entirely. If you decide that the defendant committed the uncharged offense, you may, but are not required to[,] consider that evidence for the limited purpose of deciding whether or not: Intent. The defendant acted with the intent to deprive others of their property using force or fear. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty. The People must still prove each charge or . . . allegation[] beyond a reasonable doubt." (CALCRIM No. 375.)

B.      *Additional Factual Background*.

At trial, the prosecution introduced the following evidence regarding the 1978 robbery.

Gloria Monsen was the manager of a USA gas station in Corona. One day in February 1978, Monsen and her son Ed, then 11 years old, were in a room at the station that was used as an office, counting the receipts in preparation for making a bank deposit.

When they left the office, there was a man waiting in the next room. He pointed a gun at them. He was wearing a ski mask. He said, "I'm robbing you, . . . don't try

anything." He was shaking and trembling so much that Ed Monsen was afraid the gun might go off accidentally.

Gloria Monsen gave him the money, which amounted to three days' receipts. He then made them go back into the office and blocked the door by "put[ting] a dip stick inside the door handle . . . ."

Defendant told his friend, Walter Jackman, that he had robbed the USA station. At the time, defendant was 16 or 17 years old.[3] Jackman helped defendant bury the proceeds of the robbery.

Defendant pleaded guilty to the robbery. A cashier at the gas station who acted as defendant's accomplice was also convicted.

C.    *Analysis*.

Defendant argues that, because the evidence of intent to rob in this case was so strong, the evidence of the prior robbery lacked probative value and was unduly prejudicial.

We may assume, without deciding, that the trial court abused its discretion. Even so assuming, the error is not reversible unless defendant can show "'it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error.'" (*People v. Page* (2008) 44 Cal.4th 1, 42 [brackets in original].) This he cannot do.

---

[3]    According to the probation report, defendant was actually 18. However, the jury was not told this.

There was overwhelming evidence that the victim was killed by a robber during a robbery. The DNA evidence provided incontrovertible proof that defendant was one of the robbers. Indeed, in closing argument, defense counsel conceded that defendant was one of the robbers. Thus, defendant was almost indisputably guilty of first degree murder on a felony-murder theory. (Pen. Code, § 189.)

The key issue at trial was the robbery-murder special circumstance. As the law stood in 1985, when the crime was committed, a defendant could not be subject to a robbery-murder special circumstance unless he or she acted with the intent to kill. (*People v. Rogers* (2006) 39 Cal.4th 826, 891-892.) Here, while the robber with the gun manifestly acted with intent to kill, there was little or no evidence that the second robber had the intent to kill. Accordingly, defense counsel argued vehemently that the prosecution had failed to prove that defendant was the gunman: "No intent to kill means the special circumstance is not true. No intent to kill in our fact pattern because Mr. Parker was not the shooter."

The problem with this argument is that every single eyewitness who had any recollection of the matter testified that it was the *gunman* who was injured.[4] This makes sense, as Taylor and the gunman were shooting at each other. Hence, the blood found on the passenger seat had to be from the gunman. And that blood was conclusively proven to be defendant's.

---

**4** Willis, testifying some 25 years after the event, recalled that both robbers had guns, though only one was injured. In 1985, however, he told the police that only one robber had a gun and that that robber was injured.

Admittedly, while Willis remembered that the injured gunman got into the passenger side, Parker and Coffee remembered him as getting into the driver's side. The getaway car, however, was parked on the wrong side of the street, facing the wrong way. Thus, some confusion on this point is understandable. It remains the case that any blood anywhere in the car presumably was the gunman's.

In closing argument, defense counsel argued that there were actually three robbers — one in blue, one in gray, and one in red. The eyewitnesses, however, unanimously remembered two robbers (except for Williams, who saw only one). Taylor himself said there were two robbers, and he shot one of them. The fact that witnesses reported three different colors of clothing[5] is most likely an "innocent misrecollection" (see former CALJIC No. 2.21), possibly due to the fact that the second robber may have been wearing a red shirt under the gray hoodie or a red cap.

Defense counsel also laid great stress on the fact that the gunman reportedly had a pock-marked face, but defendant did not. Coffee, however, actually told police that the gunman had a "possible" pock-marked face; at trial, she added that he may have had acne or pimples. Defendant could well have had acne or pimples in 1985, when he was in his 20's, yet have lacked any scars in 2010, when he was in his 50's. He concedes that he resembled the Identi-Kit sketch of the gunman.

It is also highly significant that the jury was instructed to consider the prior robbery solely with respect to the intent to rob. We must presume that the jury followed

---

[5]     Or four; Willis testified that the second robber was wearing tan.

this instruction (*People v. Homick* (2012) 55 Cal.4th 816, 853), unless the evidence was so prejudicial as to dispel the presumption. (See *People v. Fritz* (2007) 153 Cal.App.4th 949, 962.) Here, the prior robbery was a garden-variety armed robbery of a gas station. It was committed with the willing assistance of a cashier, no one was hurt, and at the time, defendant was quite young — indeed, according to Jackman, he was still a minor. Nothing about the prior robbery was so inflammatory that the jury would not have been able to obey the limiting instruction.

Defendant claims that the prosecutor "emphasi[zed]" the prior robbery in closing argument. Actually, she mentioned it just once in her main closing argument, arguing, consistently with the jury instruction, that it was evidence of defendant's intent to rob. Defense counsel, in his closing argument, reiterated that the prior robbery was relevant solely to intent to rob. Nevertheless, he went on to argue that it showed that defendant lacked the intent to kill: "Gloria Monsen, the manager, the mother of Eddie Monsen[,] simply turned over the money. No shots were fired. No one was injured. That's the way a robbery should go down. . . . It's not your goal to go in and start shooting people and killing people." Thus, in her rebuttal argument the prosecutor briefly stated, "The reason why he didn't shoot Eddie Monsen and Gloria Monsen was because . . . they complied." This did not invite the jury to use the evidence for an improper purpose or to act out of passion or prejudice.

Defendant also notes that the jury had some difficulty reaching a verdict. We therefore briefly review the pertinent sequence of events.

11

On the second day (i.e., the first full day) of deliberations, the jury sent out four requests for readbacks. However, it also reported that one juror was refusing to deliberate. The next day, the third day of deliberations, the trial court excused that juror due to bias, selected an alternate, and instructed the jury to start its deliberations all over again. (CALCRIM No. 3575.)

Later on the third day, the jury re-requested the same readbacks. On the fourth day of deliberations, it sent out two questions — one asking for clarification of the special circumstance's intent-to-kill requirement and one asking what would happen if it deadlocked. The trial court gave supplemental instructions on intent, and on the fifth day, it allowed counsel for both sides to deliver supplemental closing arguments. Later that day, the jury reported that it was deadlocked. The trial court, however, gave it some brief further instructions, and roughly an hour later, it returned its verdict.

In sum, then, the reconstituted jury deliberated for just three days. This is hardly excessive for the guilt phase of a death penalty case. (See *People v. Taylor* (1990) 52 Cal.3d 719, 732 ["[t]he length of the jury's deliberations cannot be said to be unduly significant in light of the gravity of its task"].) It spent much of this time hearing instructions and argument to clarify intent to kill. Moreover, in deciding whether defendant had the intent to kill, it was not likely to be influenced by the prior robbery. Indeed, in his closing argument, as already mentioned, and also in his supplemental closing argument, defense counsel claimed that the prior robbery showed that defendant did *not* have the intent to kill. Thus, nothing about the length or nature of the jury's deliberations suggests that it was prejudiced by the evidence of the prior robbery. To the

12

contrary, the record suggests that it was evaluating the evidence cautiously but conscientiously.

We therefore conclude that, even if the prior robbery had been excluded, the jury would still have found the special circumstance true. Accordingly, the claimed error was harmless.

III

THE ADMISSIBILITY OF ONE PATHOLOGIST'S TESTIMONY

BASED ON ANOTHER PATHOLOGIST'S AUTOPSY REPORT

Defendant contends that the trial court erred by allowing a pathologist who was not present at the autopsy of the victim to testify, based on the autopsy report, regarding the cause of death as well as the condition of the body.

A.      *Additional Factual and Procedural Background.*

The autopsy on the victim was performed by Dr. Rene Modglin, who therefore also wrote the autopsy report. Dr. Modglin, however, had died before trial.

Defense counsel filed a written motion in limine to preclude a "substitute coroner" from testifying to any expert opinion based on the report, arguing that this would violate the confrontation clause.

Simultaneously, the prosecution filed a motion in limine to admit the testimony of Dr. Joseph Cohen, based on the autopsy report, regarding the cause and manner of death. The prosecution specifically argued that this evidence would not violate the confrontation clause.

After hearing argument, the trial court ruled that the evidence was admissible.

13

Accordingly, at trial, Dr. Cohen testified that, in his opinion, based on the autopsy report, the cause of death was a gunshot wound, and the manner of death was homicide.

Dr. Cohen also testified regarding some of the contents of the autopsy report. For example, he testified that the victim was struck by two bullets, which caused six distinct entrance and exit wounds  One bullet traveled through the chest from right to left, indicating that, when it was fired, the gunman was on the victim's right. This bullet perforated the right lung, the liver, the spleen, and the largest vein in the body, causing massive internal bleeding. It could have caused the victim to fall to the ground.

The other bullet traveled downward through the body, from the left shoulder to the left elbow. Thus, it was most likely that, when it was fired, the victim was on the ground, facing the gunman.

The prosecution did not introduce the autopsy report itself as an exhibit. However, it did introduce a copy of the victim's death certificate.

A.      *Additional Factual and Procedural Background*.

While this appeal was pending, the California Supreme Court decided *People v. Dungo* (2012) 55 Cal.4th 608. *Dungo* is on point and controlling here.

In *Dungo*, the defendant was charged with murder. The autopsy of the victim had been performed by Dr. Bolduc. At the time of trial, there was no indication that Dr. Bolduc was unavailable. (*People v. Dungo*, *supra*, 55 Cal.4th at p. 613.) Nevertheless, the prosecution called Dr. Lawrence, who testified that, in his opinion, based on the autopsy report and the accompanying photographs, the victim had died as a result of strangulation. Dr. Lawrence also listed certain conditions of the victim's body,

14

as set forth in the autopsy report and/or the photographs, that supported his conclusion: neck hemorrhages, pinpoint hemorrhages of the eyes, the purple color of the face, bite marks on the tongue, and the absence of any signs of any other cause of death. Finally, based on the finding in the autopsy report that the victim's hyoid bone was not fractured, Dr. Lawrence opined that the strangulation lasted for at least two minutes. (*Id.* at p. 614.) The autopsy report itself was not admitted into evidence. (*Id.* at p. 615.)

The Supreme Court held that the admission of this evidence did not violate the confrontation clause because the factual information in the autopsy report regarding the condition of the body was not testimonial. (*People v. Dungo*, *supra*, 55 Cal.4th at pp. 619-621.) It began by noting: "[T]he prosecution's use of testimonial out-of-court statements 'ordinarily violates the defendant's right to confront the maker of the statements unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination.' . . . [T]estimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Id.* at p. 619.)

The court concluded that an autopsy report's observations about the condition of the body — as opposed to any conclusions based on those observations — are not so formal as to be testimonial. (*People v. Dungo*, *supra*, 55 Cal.4th at pp. 619-620.) Rather, "[t]hey are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the

15

appropriate treatment.  Such observations are not testimonial . . . . [Citation.]" (*Ibid*., fn. omitted.)

The court also concluded that "criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of [the victim's] body; it was only one of several purposes." (*People v. Dungo*, *supra*, 55 Cal.4th at p. 621.)  It explained that a coroner is statutorily required to determine the cause of certain types of death, including types that are not related to criminal activity.  (*Id*. at p. 620.)  It also noted, "The usefulness of autopsy reports, including the one at issue here, is not limited to criminal investigation and prosecution; such reports serve many other equally important purposes.  For example, the decedent's relatives may use an autopsy report in determining whether to file an action for wrongful death.  And an insurance company may use an autopsy report in determining whether a particular death is covered by one of its policies.  [Citation.]  Also, in certain cases an autopsy report may satisfy the public's interest in knowing the cause of death, particularly when (as here) the death was reported in the local media.  In addition, an autopsy report may provide answers to grieving family members." (*Id*. at p. 621.)

Defendant argues that *Dungo* is in conflict with certain United States Supreme Court cases[6] and thus wrongly decided.  Even if we were to agree — and we do not — we would be bound by the California Supreme Court's construction of those cases, which

---

**6**  In particular, defendant cites *Bullcoming v. New Mexico* (2011) ___ U.S. ___ [131 S.Ct. 2705, 180 L.Ed.2d 610] and *Williams v. Illinois* (2012) ___ U.S. ___ [132 S.Ct. 2221, 183 L.Ed.2d 89].

16

predated *Dungo*. (See *People v. Madrid* (1992) 7 Cal.App.4th 1888, 1895 ["we are bound by decisions of the United States Supreme Court [citation] and, of course, by California Supreme Court cases interpreting those decisions"]; see also *People v. Birks* (1998) 19 Cal.4th 108, 116, fn. 6 [state Court of Appeal has no authority to overrule decision of state Supreme Court].)

Defendant also argues that *Dungo* is distinguishable. His entire argument on this point, however, is to the effect that a *death certificate* is distinguishable from an *autopsy report* and thus should be deemed testimonial. Defendant does not appear to dispute that *Dungo* is controlling with regard to the autopsy report in this case and specifically with regard to Dr. Cohen's testimony based on the autopsy report.

Defense counsel did not object to the death certificate based on the confrontation clause. Hence, defendant has forfeited this particular contention. (Evid. Code, § 353, subd. (a).) Admittedly, defense counsel did object based on *People v. Holder* (1964) 230 Cal.App.2d 50, which held that a death certificate is evidence of "bald factual entries, for example, the fact of death, time and place of death, character of the injuries and time and place of the accident or other trauma-producing event," but is not evidence of "conclusionary statements drawn from an autopsy . . . ." (*Id*. at p. 55.) In this appeal, defendant does not reassert *Holder*.

Even if not forfeited, defendant's contention regarding the death certificate lacks merit. A death certificate is required in connection with every death. (Health & Saf. Code, § 102775.) "Business and public records are generally admissible absent confrontation . . . because — having been created for the administration of an entity's

17

affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial." (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 324 [129 S.Ct. 2527, 174 L.Ed.2d 314].)  Thus, a death certificate is even less testimonial than an autopsy report.

We conclude that the trial court did not err by admitting Dr. Cohen's testimony and conclusions regarding the autopsy report.

IV

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI_____
Acting P. J.

We concur:

KING_____
J.

MILLER_____
J.

18

| Witness | Parker | Coffee | Salmon | Liddicote | Willis | Williams |
|---|---|---|---|---|---|---|
| **Number of Robbers** | Two | Two | Two | Two | Two | One |
| **Gunman**: Clothing | Blue plaid shirt | Blue plaid Pendleton | Blue plaid flannel shirt | | Red and brown Pendleton | |
| Facial hair | Moustache | Moustache | No facial hair | | | |
| Hair | Dark brown | Dark brown | Black | | | |
| Height | 5'10" | 5'10"-6' | 5'8" | | | |
| Build | Slender | Slender, 175 lbs. | | | | |
| Other | Pock-marked face | "Possible" pock-marked face | | | | |

| Second Robber: Clothing | Gray hoodie[7] | Gray hoodie | | Red hoodie[8] | Tan jacket | Red hoodie[9] |
|---|---|---|---|---|---|---|
| Facial hair | | Moustache | | Moustache | | |
| Hair | | Blond | | Brown | | |
| Height | 5'10" | 6'-6'2"0 | | 5'10"-6' | | |
| Build | Slender, 150-160 lbs. | 175-180 lbs. | | Medium | | |
| **Injured Robber** | | | Gunman | Gunman | Gunman | |
| **Injured Robber Hit In** | | | Left leg | Leg | Right leg (at trial) Left leg and left arm (to police) | |

---

**7**     According to the police officer who interviewed Parker, Parker said the second man was wearing a gray sweatshirt over a red plaid shirt. He admitted, however, that his report did not mention a red plaid shirt and that this information may have come from another witness.

**8**     Liddicote admitted that his description was a "combination" of the two men he saw. We have somewhat arbitrarily placed it under "Second Robber."

**9**     Williams saw only one robber, who was the driver of the getaway car. We have somewhat arbitrarily placed her description under "Second Robber."

APPENDIX A

| **Gunman/Injured Robber Got Into** | Gunman got into driver's side | Gunman got into driver's side | [10] | | Gunman/injured person got into passenger side | |
|---|---|---|---|---|---|---|

**[10]** The People claim that Salmon saw the injured gunman get into the driver's side. Actually, at trial, she did not remember seeing a car at all. She admitted that, if she told the police something different, then that was probably the truth. However, her statement to the police was never admitted into evidence.

APPENDIX A