Filed 6/25/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PAUL MARSHAL CURRY, | |
|     Petitioner, | |
|       v. | G047000 |
| THE SUPERIOR COURT OF ORANGE COUNTY, | (Super. Ct. No. 10CF3053) |
| | O P I N I O N |
|     Respondent; | |
| THE PEOPLE, | |
|     Real Party in Interest. | |

        Original proceedings; petition for a writ of prohibition/mandate to challenge an order of the Superior Court of Orange County, Richard F. Toohey, Judge. Petition denied.

        Frank Ospino, Public Defender, Jean Wilkinson, Chief Deputy Public Defender, Mark S. Brown, Assistant Public Defender, and Martin F. Schwarz, Deputy Public Defender, for Petitioner.

Tony Rackauckas, District Attorney, and Matthew Lockhart, Deputy District Attorney, for Real Party in Interest.

\*               \*               \*

Petitioner Paul Marshal Curry stands accused of murdering his wife Linda for financial gain by means of poison. Although Linda died in 1994, petitioner was not charged until 2010, after forensic testing confirmed Linda, a nonsmoker, had lethal levels of nicotine in her system when she died. At the preliminary hearing, a homicide investigator with no specialized scientific training testified about the forensic evidence forming the basis for the prosecution's case. Over petitioner's objection, the investigator was also allowed to convey the expert opinions of two doctors who believe Linda died from nicotine poisoning. Petitioner contends the investigator's lack of knowledge about the scientific evidence and expert opinions he conveyed rendered his testimony unreliable, and therefore he should not have been bound over for trial. We disagree and deny his petition for relief.

## FACTS

Petitioner and Linda met while working at the San Onofre nuclear power plant in the late 1980's. They got married in 1992, and a short time later they had a barbeque at their house that Linda's boss and his wife Betty Reeder attended. At the barbeque, Reeder heard petitioner boast that he could kill a person without being apprehended. Specifically, he claimed he could make a deadly poison in his garage and administer it to someone without ever getting caught.

In 1993, Linda was hospitalized due to severe nausea, vomiting and diarrhea. Despite extensive testing, her doctors were unable to determine the cause of her illness. While Linda was in the hospital, the police asked her if she knew anyone who might want to harm her. She said petitioner might want to kill her because they were having money problems.

Upon her release from the hospital, Linda spoke with her former boyfriend Bill Sandretto. Linda told Sandretto petitioner wanted her to purchase a $1 million life insurance policy, but she was reluctant to do so. In fact, she said she didn't even want petitioner to be the beneficiary under her existing policies. She also told Sandretto that she and petitioner had no sex life.

In January 1994, Linda was hospitalized with the same symptoms, and again doctors were unable to determine their cause. One of Linda's nurses during that time was Nancy Row. One day, Row spoke with petitioner after she saw him leave Linda's room. Petitioner told Row that Linda was fine, but a couple of minutes later, Linda's intravenous alarm went off. Upon responding to Linda's room, Row found her intravenous port broken in an odd way. Row had never seen a port broken in that manner before, so she called the police. After interviewing petitioner about the incident, the sheriff's department reported it as a "potential tampering."

Five months later, in the early morning hours of June 10, 1994, Linda died in her home. According to petitioner, Linda had said she was feeling tired when she came home from work the night before. She went to bed around 6:00 p.m., and petitioner joined her there a while later. Around midnight, petitioner was awakened by their cat and noticed Linda was not breathing. He called 911, but the responding paramedics were unable to revive her.

Linda's autopsy was performed by Dr. Joseph Halka, a pathologist with the Orange County coroner's office. Initially, Dr. Halka was unable to determine the cause of Linda's death, but after additional toxicology testing was conducted, he determined she died from nicotine and cadmium poisoning. He believed the poison was either injected or ingested.

As reflected in Linda's death certificate, Dr. Halka reached that conclusion in 1995. However, petitioner was not charged until 2010, after still more toxicology testing was done. Conducted under the supervision of Dr. Neil Benowitz at the

3

University of California at San Francisco (UCSF), that testing indicated Linda had a lethal amount of nicotine in her system when she died. Dr. Benowitz surmised the drug was administered to Linda within two hours of her death, and she likely died from "massive nicotine poisoning."

In light of these findings, the police tracked down petitioner in Salina, Kansas. In an interview conducted in November 2010, petitioner told investigators he received about $300,000 from Linda's life insurance policies and another $100,000 or so in stock options and pension benefits. He also admitted that after Linda died, he made a fraudulent insurance claim on a Rolex watch that belonged to her. (Petitioner reported the watch had been stolen; he had actually given it to Linda's sister.) At the end of the interview, the investigators arrested petitioner for murdering Linda. When informed that Linda died from nicotine poisoning, petitioner, who admitted Linda did not smoke, said, "I don't know how to respond to this."

In a complaint filed on November 9, 2010, petitioner was charged with first degree murder and insurance fraud. (Pen. Code, §§ 187, subd. (a); 550, subd. (a)(1).)[1] Special circumstance allegations the murder was committed by means of poison and for financial gain were also alleged. (§ 190.2, subds. (a)(1) & (a)(19).)

The above evidence was presented at petitioner's preliminary hearing by investigators with the Orange County Sheriff's Department. Their testimony was based primarily on information they obtained from conducting witness interviews, so much of it was hearsay. Petitioner does not challenge all of what they had to say. Rather, he targets the expert opinions of Dr. Halka and Dr. Benowitz and the scientific testing they relied on to formulate their opinions. Petitioner contends that evidence should have been excluded because the investigator who conveyed it to the court did not know enough about the subject matter of his testimony to ensure it was reliable.

---

[1]     Unless noted otherwise, all further statutory references are to the Penal Code.

4

That investigator was Ken Hoffman. Hoffman has been a peace officer since 1984 and is currently assigned as a homicide investigator with the Orange County Sheriff's Department. As part of that assignment, Hoffman assisted in the investigation surrounding Linda's death. At the request of the prosecutor, and in anticipation of petitioner's preliminary hearing, he interviewed Dr. Halka and Dr. Benowitz about their findings and opinions in the case, as reflected in the reports they prepared. Hoffman had copies of those reports, as well as Dr. Halka's and Dr. Benowitz's resumes, when he interviewed them.

Explaining his interview with Dr. Halka, Hoffman testified he spoke with him by telephone on September 27 and 28, 2011. Dr. Halka informed him he is a licensed physician and has practiced forensic pathology for nearly 40 years. He began working as a medical examiner for Orange County in 1986, and in that capacity he has conducted approximately 15,000 autopsies to determine the cause and manner of death. During that time, he has also testified as an expert witness on those issues.

Dr. Halka told Hoffman that when he conducted Linda's autopsy in 1994, he was initially unable to determine the cause of her death. Therefore, he ordered special toxicology testing to be performed on samples of Linda's nails, skin, hair, blood, urine and tissue. That testing was conducted by an outside lab that was under contract with Orange County to perform such testing. In Dr. Halka's words, this testing went "beyond the standard toxicology and microbiology testing" that is done in most cases. When the testing data came back, Dr. Halka analyzed the results and determined Linda's death was a homicide. More specifically, he opined Linda suffered acute pulmonary edema and intoxication from the combined effects of nicotine and cadmium poisoning, and those substances entered her body by means of injection or ingestion.[2]

---

[2] Dr. Halka reached these conclusions independently of Dr. Benowitz's findings, which are discussed in detail *post*. In fact, Hoffman testified he did not believe Dr. Halka used *any* information from Dr. Benowitz when he made his findings about the cause of Linda's death in 1995.

5

On cross-examination, Hoffman admitted he does not have any special scientific training or expertise. He also admitted he was not present during Linda's autopsy or initially involved with the investigation into her death. In addition, Hoffman admitted he did not know which lab conducted the toxicology testing Dr. Halka relied on, what type of testing was performed at the lab, or whether proper scientific methods were utilized in the testing process. Hoffman also conceded he did not ask Dr. Halka if he has worked on any other cases involving nicotine or cadmium poisoning or if he has had any training on how those substances affect the human body.

Although the toxicology testing Dr. Halka relied on to formulate his opinions was "special" and "above the norm," Hoffman testified it was still not to the level of testing that was conducted by Dr. Benowitz and his team at UCSF. During his investigation, Hoffman learned that when Linda's autopsy was conducted in 1994, samples of her blood and urine were sent to Dr. Benowitz's lab. The record does not disclose what type of testing Dr. Benowitz conducted or what results he obtained at that time. However, in 2009, Dr. Benowitz's team retested the samples. Since this was a key component of the prosecution's case, Hoffman focused on the results of this retesting when he interviewed Dr. Benowitz in preparation for petitioner's preliminary hearing.

By way of background, Dr. Benowitz told Hoffman he has been a professor of medicine and psychiatry at UCSF since 1974 and is currently the head of the school's division of clinical pharmacology and experimental therapeutics. He holds a California medical license and is certified by the American Board of Internal Medicine in toxicology and clinical pharmacology. In addition, he has conducted extensive research and published numerous studies and articles on the impact of nicotine on the human body.

Dr. Benowitz informed Hoffman that besides inhalation, nicotine can also enter a person's body by means of ingestion, absorption or injection. He said that if someone were to soak a cigarette or chewing tobacco in rubbing alcohol, the tobacco

6

could be "reduce[d] . . . down," and its nicotine-laden contents could then be introduced into a person's system by the latter three means. And if that were to occur, the person would likely experience an increased heart rate, nausea and vomiting. Nicotine being a poison, a high dosage could result in death.

Speaking to this case, Dr. Benowitz told Hoffman he supervised his colleagues Dr. Peyton Jacob and research analyst Lisa Yu when Linda's blood and urine samples were retested in 2009. They used a gas chromatograph with nitrogen phosphorus detection to ascertain the nicotine level in the samples. Describing this testing procedure as a "well-established scientific method," Dr. Benowitz told Hoffman his lab utilizes it "quite often."

To find out more about the testing, Hoffman also spoke to Yu and Dr. Jacob. Yu said she conducted the actual testing and Dr. Jacob oversaw her work. Then, once the testing was completed, they met with Dr. Benowitz to discuss and analyze the results.[3]

According to Dr. Benowitz's report, Linda's test results showed she had a blood nicotine concentration of 1,120 nanograms per milliliter. Dr. Benowitz told Hoffman that level was "extraordinarily high" and "likely to be fatal." In fact, it was three times higher than a prior case he had worked on that involved "extreme nicotine poisoning." In light of this finding, Dr. Benowitz opined Linda's death was "consistent with a catastrophic illness as would have been caused by massive nicotine poisoning." He also believed the nicotine was introduced into her system within two hours of her death.

On cross-examination, Hoffman admitted he does not know how a gas chromatograph works or exactly how the machine was used to test Linda's blood and

---

[3] This wasn't the first time Yu and Dr. Jacob had collaborated with Dr. Benowitz. Yu said they have worked together on several scientific papers regarding the effects of nicotine on the human body, and one of those papers involved a testing method similar to the one that was utilized in this case.

urine samples. He also did not know the last time the equipment in Dr. Benowitz's lab was calibrated or how many nanograms are in a milliliter. In addition, Hoffman said he did not ask Dr. Benowitz whether he tested Linda's samples for cadmium or how nicotine and cadmium interact in the body. And even though Dr. Benowitz's report indicated he "modified" the testing method in this case to allow for the "simultaneous extraction of nicotine, cotinine and caffeine," Hoffman did not ask him if that was a standard modification. Nor did he ask Dr. Benowitz if he knew the form of nicotine that poisoned Linda (e.g., liquid or solid) or the method by which it was introduced into her system.

Hoffman was aware that Dr. Benowitz's lab receives research grants, contracts for services and does "a lot of different types of things under a lot of different programs." However, he did not question Dr. Benowitz in detail about any specific cases he had previously worked on or ask him whether, prior to this case, he had ever conducted an examination to determine the cause of a person's death. Nor did he ask him what his level of experience was with the injection, ingestion or absorption of nicotine.

During Hoffman's testimony, defense counsel made a continuing objection to the expert opinions he conveyed to the court regarding the cause of Linda's death. Defense counsel argued Hoffman simply did not have sufficient scientific knowledge to distill the information he received from Dr. Halka and Dr. Benowitz and convey it in a meaningful and reliable fashion. However, the magistrate denied defense counsel's motion to exclude Dr. Halka's and Dr. Benowitz's expert opinions on that basis. In light of those opinions, and all of the other information he received, the magistrate determined there was sufficient evidence to bind petitioner over for trial. Petitioner challenged that ruling by way of a section 995 motion in the trial court, but the motion was denied. He then filed the present petition for a writ of prohibition/mandate to overturn that decision. For the reasons explained below, we deny the petition.

8

DISCUSSION

Petitioner argues the court erred in admitting the expert opinions of Dr. Halka and Dr. Benowitz, and without their opinions there is insufficient evidence to support the charges against him. The People contend the expert opinions were properly admitted, and even without them, there is sufficient evidence to hold petitioner over for trial. We believe the magistrate properly admitted the challenged evidence. Despite Hoffman's lack of scientific training, his testimony was sufficiently reliable to justify the admission of Dr. Halka's and Dr. Benowitz's expert opinions into evidence.

The purpose of a preliminary hearing is to establish whether there is probable cause to believe the defendant has committed a felony. (§ 866, subd. (b).) """[P]robable cause is shown if a man (or woman) of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused."' [Citations.]" (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474.) That is the sole inquiry. Guilt or innocence is not determined. It is not a vehicle for discovery. (§ 866 (b); *Whitman v. Superior Court* (1991) 54 Cal.3d 1063, 1080-1081 (*Whitman*),)

In order to streamline the preliminary hearing process, the voters enacted Proposition 115 in 1990. That measure amended the California Constitution and the Penal Code to allow hearsay evidence at preliminary hearings. (*Whitman, supra,* 54 Cal.3d 1063, 1072-1073.) Although hearsay evidence is generally inadmissible at trial, section 872 states that a finding of probable cause at a preliminary hearing "may be based in whole or in part upon the sworn testimony of a law enforcement officer . . . relating the statements of declarants made out of court offered for the truth of the matter asserted." (§ 872, subd. (b).)

Section 872 requires the testifying officer either have five years of law enforcement experience or have completed a training course on the investigation and reporting of cases. (§ 872, subd. (b).) But the statute does not restrict the type of hearsay declarants to which it applies. Because of this, courts have interpreted section 872

9

broadly to include not only the extrajudicial statements of crime victims and percipient witnesses, but law enforcement officers and expert witnesses alike.  (*Whitman, supra,* 54 Cal.3d at p. 1073; *Hosek v. Superior Court* (1992) 10 Cal.App.4th 605, 608-609 (*Hosek*).)

The statute is not without limits, however.  In *Whitman*, our Supreme Court made clear that Proposition 115 "does not authorize a finding of probable cause based on the testimony of a noninvestigating officer or 'reader' merely reciting the police report of an investigating officer.  . . .  The testifying officer . . . must not be a mere reader but must have sufficient knowledge of the crime or the circumstances under which the out-of-court statement was made so as to meaningfully assist the magistrate in assessing the reliability of the statement."  (*Whitman, supra*, 54 Cal.3d at pp. 1072-1073.)

The testifying officer in *Whitman* lacked such knowledge.  He was not involved with the defendant's arrest for driving under the influence, nor was he personally aware of the circumstances under which the defendant's sobriety tests, including a blood test, were conducted.  And because he did not speak with the arresting officer about his report, he was completely ignorant of the circumstances under which the report was made.  However, at the preliminary hearing, his testimony about the contents of the report served as the main basis for the defendant's bindover.  (*Whitman, supra*, 54 Cal.3d at pp. 1068-1069.)

The Supreme Court found this extremely troubling.  The problem was, the testifying officer's connection to the case was so attenuated there was no way for the magistrate to ensure the information conveyed from the arrest report was reliable.  The court was particularly concerned the testifying officer "was unable to answer any potentially significant questions regarding the methods and circumstances of [the arresting officer's] investigation, including the time the report was written, the details of the sobriety tests given . . . , and [the defendant's] pupil reaction and degree of dilation.  Indeed, [the testifying officer] was even uncertain how long [the arresting officer] had

10

been employed on the force or even whether [the arresting officer] was a male or a female." (*Whitman, supra*, 54 Cal.3d at pp. 1074-1075.)

Given these evidentiary gaps, the Supreme Court determined the hearsay evidence presented at the preliminary hearing lacked sufficient indicia of reliability to support the defendant's bindover. (*Whitman, supra*, 54 Cal.3d at p. 1075.) As a warning for future cases, the court also cautioned that "[s]imilar uncertainties are inherent in any procedure in which the testifying officer acts as no more than a 'reader' of another officer's investigative report" and simply "parrot[s]" what is in that report. (*Id.* at pp. 1075, 1073.)

But Investigator Hoffman was no mere parrot. At the preliminary hearing, he testified he has been personally involved with the investigation into Linda's death. Although he was not present at Linda's autopsy, he was familiar with Dr. Halka and had worked with him in the past. Rather than just *reading* the reports, Hoffman studied them, read the doctors' resumes, and then conducted telephone interviews of both witnesses. When he interviewed Dr. Halka and Dr. Benowitz, he had their resumes and their reports in front of him. This allowed him to use that information as the basis for his questioning. In fact, Hoffman testified that when he spoke to Dr. Halka, he went over every section of his autopsy report with him. Consequently, Hoffman was able to garner a significant amount of information from Dr. Halka and Dr. Benowitz. Whereas virtually nothing was known about the out-of-court declarant in *Whitman*, Hoffman was able to explain in considerable detail both the qualifications of Dr. Halka and Dr. Benowitz and the basis for their opinions as to the cause of Linda's death.

Still, petitioner argues that in light of the complexity of the investigation and the testing techniques involved in this case, Hoffman did not know enough about the substance of his testimony to meaningfully assist the court in assessing the reliability of the information he conveyed. In so arguing, petitioner relies heavily on *Hosek, supra*, 10 Cal.App.4th 605, a case from the Fifth District Court of Appeal.

11

Like *Whitman*, *Hosek* was a drunk driving case. However, unlike *Whitman*, the arresting officer in *Hosek* actually testified at the defendant's preliminary hearing. After explaining the factual basis for the arrest, the officer testified about the defendant's blood test, which was analyzed by a criminalist named Steve Woicheson. (*Hosek, supra*, 10 Cal.App.4th at pp. 607-608.) The heart of the case was the admissibility of the interview statements that Woicheson made to the officer in anticipation of the preliminary hearing.

Describing those statements, *Hosek* explained that Woicheson told the officer he "is certified by the Department of Health to perform blood-alcohol analysis, and his laboratory is licensed by the Department of Health. Woicheson has a bachelor of arts degree in police science, with a minor in chemistry. He has completed a 120-hour course on blood-alcohol analysis and a 40-hour update course. Woicheson tested defendant's blood sample using a testing method he has employed on more than 10,000 occasions. . . . Woicheson reported the blood sample . . . contained .18 percent alcohol." (*Hosek, supra*, 10 Cal.App.4th at p. 608.)

On cross-examination, the testifying officer in *Hosek* admitted he did not know the name of the machine that produced that result, how the machine worked or what safeguards for reliability were utilized in testing the defendant's blood sample. (*Hosek, supra*, 10 Cal.App.4th at pp. 607-608.) However, the *Hosek* court determined it was not necessary for the officer to know this information in order to ensure his testimony was reliable. Precise understanding of the testing process by the officer was not required in the court's view because Woicheson had told him that his lab was licensed and he had used the subject test over 10,000 times. In light of these representations, the court determined it was "reasonable to infer . . . the laboratory had complied with the regulations for licensed laboratories and that the present test was an unremarkable example of the routine testing procedure." (*Id*. at p. 610.) In other words,

12

"the routine nature of the expert evidence . . . provide[d] its own assurance of reliability sufficient for preliminary hearing purposes." (*Id.* at p. 611.)[4]

Of course, not all expert evidence can be fairly characterized as "routine." Recognizing this, the *Hosek* court described three situations in which there may not be sufficient indicia of reliability to permit the introduction of an expert's extrajudicial statements: 1) If the testifying officer says the expert expressed doubts about a test result; 2) if the officer failed to ask the expert whether the test results appeared valid and unexceptional; or 3) the officer does not understand enough about the test results to meaningfully convey the expert's conclusions to the court. (*Hosek, supra,* 10 Cal.App.4th at p. 610.)

Speaking to the last situation, the *Hosek* court stated, "The results of a highly sophisticated test may not be understandable to the magistrate without the kind of interpretation and explanation only a knowledgeable expert could give." (*Hosek, supra*, 10 Cal.App.4th at p. 610.) However, the court did not believe the test results at issue in that case rose to this level. Because those results were conveyed "in terms of the statutory measure for such tests, namely, 'grams of alcohol per 100 milliliters of blood[,]'" the court determined that further explanation or interpretation of those results was not required. (*Ibid*.) Keeping in mind that "the degree of reliability required at the preliminary hearing is rather limited, in light of the limited purposes of the hearing," the court concluded the officer provided enough information about the expert statements he conveyed to ensure they were reliable. (*Id*. at p. 610.)

---

4       The court observed, "Detailed regulations for conducting blood-alcohol analysis are set forth in the California Code of Regulations . . . .  By establishing recordkeeping . . ., training . . ., and quality control . . . requirements, the regulatory scheme is intended to provide assurance that test results will be scientifically valid. [Citation.]  In the absence of testimony showing that the present test deviated from these regulatory norms, the regulations provide ample assurance of reliability." (*Hosek, supra*, 10 Cal.App.4th at p. 611.)

13

Not surprisingly, the parties in the present case dispute the meaning and significance of the *Hosek* decision. Petitioner contends, "The *Hosek* court gave three examples of when the hearsay declarations of experts *would* be unreliable[.]" (Italics added.) However, in prefacing the three examples it set forth, the *Hosek* court actually said they represent situations in which the magistrate or a reviewing court "*might* conclude that an officer's testimony does not provide a sufficient indication of reliability to permit introduction of the extrajudicial statement." (*Hosek, supra*, 10 Cal.App.4th at p. 610, italics added.) Thus, *Hosek* does not *compel* exclusion of expert testimony if the expert expresses doubt about the test results at issue, the officer failed to ask the expert if the results appeared valid and unexceptional, or the testing process at issue is highly sophisticated. Rather, those circumstances are merely factors that bear on the ultimate question of reliability.

And they are not the only factors. As *Hosek* illustrates, whether the testing lab in question was licensed and whether the test results it produced were formulated in terms of the applicable regulatory scheme are also germane to the reliability issue. While the People try to downplay the significance of the regulatory testing scheme in *Hosek*, describing it as "just one factor" in the court's analysis, it is readily apparent that licensing and regulatory compliance were significant aspects of the *Hosek* decision.

In contrast to *Hosek*, there was no direct evidence about laboratory licensing in this case. Nevertheless, the People contend it would be reasonable for us to infer 1) the labs that tested Linda's blood and urine samples were licensed by the state, and 2) the testing was conducted pursuant to all applicable regulations.[5] In making this argument, they refer only to the Orange County coroner's lab, where Dr. Halka conducted Linda's autopsy, and Dr. Benowitz's lab at UCSF, which they describe as "a well-known and prestigious institution." They do not mention the fact that Dr. Halka sent

---

[5] The People do not identify which particular regulations would apply in this case.

14

Linda's samples to an unidentified outside lab for special toxicology testing and that Dr. Halka relied on the results from this testing to determine the cause of Linda's death.

It seems to us this fact has logical bearing on the reliability of Dr. Halka's opinions. Although we may presume Dr. Halka regularly performed his statutory duty to investigate the cause of Linda's death (see Gov. Code, § 27491 [coroner must investigate "the circumstances, manner, and cause of all violent, sudden, or unusual deaths"]; Evid. Code, § 664 [presumption that an official duty is regularly performed]; *People v. Dungo* (2012) 55 Cal.4th 608 [discussing scope and nature of medical examiner's duties]), that presumption does not extend to the outside testing he relied on in forming his conclusions about how Linda died.

Basically, all we know about that testing is that it was conducted by a lab that was under contract with Orange County to perform microbiology and toxicology testing. We don't know if the lab was licensed, we don't know the qualifications of the people who tested Linda's samples, we don't know the type of testing they conducted or if they followed proper scientific methods, and we don't know what results they obtained. Apparently, Investigator Hoffman simply did not obtain any of that information from Dr. Halka when he interviewed him before the preliminary hearing. Nor did he ask Dr. Halka if he had previously worked on any cases involving nicotine or cadmium poisoning or if he had any training on how those particular substances affect the human body.

Does that mean that Dr. Halka's opinion regarding the cause of Linda's death should have been excluded as unreliable? We think not. While that information might have been helpful, it is not required. The law allows pathologists to rely on toxicology testing preformed by third parties in formulating their opinions about the cause of a person's death, as the case of *People v. Catlin* (2001) 26 Cal.4th 81 (*Catlin*) makes clear.

15

In *Catlin*, the defendant was convicted of killing his mother Martha by means of paraquat poisoning. The conviction rested in part on the testimony of Dr. Dollinger, a pathologist who conducted Martha's autopsy. (*Catlin*, *supra*, 26 Cal.4th at p. 102.) Because Dr. Dollinger had no previous experience with paraquat poisoning, and because he relied on toxicology testing conducted by an outside lab, the defendant argued he should not have been allowed to give his opinion that Martha died from paraquat poisoning.

The Supreme Court disagreed. In upholding Dr. Dollinger's expert testimony, the court stated: "[A] pathologist commonly has expertise in interpreting both the clinical evidence of disease or tissue damage and laboratory results showing the presence of disease agents or toxic materials in human tissue. [Citation.] Dr. Dollinger testified that he had performed in excess of 11,000 postmortem examinations or autopsies and that he had studied the medical and scientific literature regarding paraquat toxicology. We do not believe that Dr. Dollinger's reliance upon laboratory results performed by other professionals required the trial court to find him unqualified to offer an expert opinion on the cause of Martha's death. [Citation.] Dr. Dollinger had sufficient specialized training, in addition to the particular experience of having performed the autopsy on Martha, to have reached an informed conclusion as to the cause of her death, despite the circumstance that he had not previously performed an autopsy in a case in which the cause of death was paraquat poisoning." (*Catlin*, *supra*, 26 Cal.4th at pp. 132-133, fn. omitted.)

Petitioner attempts to distinguish *Catlin* on the basis Dr. Dollinger, unlike Dr. Halka, was available for cross-examination, and his testimony was adduced at trial, as opposed to a preliminary hearing. However, the availability of cross-examination had no bearing on the Supreme Court's analysis in *Catlin*. (See *Catlin*, *supra*, 26 Cal.4th at p. 133, fn. 12.) And since the rules of evidence and standard of proof are more stringent at

trial than a preliminary hearing, it stands to reason that *Catlin*'s analysis would apply *a fortiori* in the context of this case.

Dr. Halka has practiced in the field of pathology for nearly 40 years. He has conducted approximately 15,000 autopsies and is an expert in determining the cause and manner of death. Given his vast experience, and considering he personally conducted Linda's autopsy, we believe he was sufficiently qualified to render an opinion on the cause of Linda's death. Even though his training and experience in the particular area of nicotine and cadmium poisoning were not disclosed at the preliminary hearing, and even though he relied on lab testing conducted by other professionals, his expert opinion that Linda died from nicotine and cadmium poisoning was sufficiently reliable for preliminary hearing purposes. We therefore conclude the magistrate properly overruled petitioner's objections to his opinion in that regard.

Sufficient indicia of reliability also accompanied Dr. Benowitz's expert opinions. As Hoffman explained, Dr. Benowitz is a board certified toxicologist who heads UCSF's division of clinical pharmacology and experimental therapeutics. And he has published numerous articles and studies on how nicotine affects the human body. Although there was no evidence as to whether Dr. Benowitz's lab was licensed when it tested Linda's blood and urine samples, it is reasonable to believe his eminent scientific qualifications imbued his opinions with a degree of reliability.

Hoffman's testimony made clear that in addition to Dr. Benowitz, Dr. Jacob and research analyst Yu were also involved in the process of testing and analyzing Linda's blood and urine samples. Dr. Jacob oversaw Yu during the actual testing, and then they both met with Dr. Benowitz to discuss and interpret the testing data. Thus, three different scientists, all of whom have experience in nicotine testing and analysis, had input in the testing process and contributed to the final results. The fact they collaborated as a group suggests that there were checks and balances in the testing process.

17

To be sure, not much was known about the particular testing device they utilized. Indeed, Hoffman said he does not know how a gas chromatograph works or how it was used to test Linda's samples. Nor did he know anything about calibration frequency or quality control measures in Dr. Benowitz's lab. Essentially, all Hoffman knew about the testing process is that it resulted in a finding that Linda's blood nicotine level concentration was 1,120 nanograms per milliliter.

However, Hoffman did more than merely ascertain raw measurement data from Dr. Benowitz. Recognizing the data would mean little to most nonscientists, Hoffman questioned Dr. Benowitz about what the testing results meant in practical terms. Dr. Benowitz explained that a nicotine level of 1,120 nanograms per milliliter was "extraordinarily high" and "likely to be fatal" in Linda's situation. And to bring home this point, he compared it to another case he had worked on that involved "extreme nicotine poisoning." He said Linda's nicotine level was three times higher than the person in that case, so it was easy to understand the basis for Dr. Benowitz's ultimate opinions. As the People rightly assert, this comparison provided meaning and context to the raw testing data Hoffman related to the court. Despite its complexity, the testing evidence was not so sophisticated so as to defy understanding by the magistrate.

Moreover, Dr. Benowitz described the testing process as a "well-established scientific method" which he and his colleagues have used "quite often." No exact figure was given in terms of usage, but it was reasonable for the magistrate to conclude the process, like that in *Hosek*, was rather routine. There is nothing in the record to suggest Dr. Benowitz expressed any doubt about the testing results or that they were somehow inaccurate, invalid or untrustworthy.

All things considered, we are satisfied Dr. Benowitz's opinions were sufficiently reliable for purposes of petitioner's preliminary hearing. It is clear Hoffman did not merely "parrot" Dr. Benowitz's extrajudicial statements at the hearing but instead went to appropriate lengths to enable him to accurately describe the circumstances under

18

which the statements were made "so as to increase the reliability of the underlying evidence." (*Whitman, supra*, 54 Cal.3d at p. 1074.) While he could not conduct a seminar on the detection of nicotine poisoning or the intricacies of gas chromatography, he was adequately prepared to aid the magistrate's probable cause determination. We therefore conclude the magistrate correctly admitted his testimony about Dr. Benowitz's findings.

Viewed in conjunction with Dr. Halka's opinions, and the rest of the evidence that was presented at the preliminary hearing, Dr. Benowitz's opinions provided ample probable cause to believe petitioner murdered Linda by means of poison and for financial gain. We thus affirm the magistrate's decision to bind petitioner over for trial on those charges, as well as the charge of insurance fraud. There is no basis for disturbing that decision or the subsequent denial of petitioner's section 995 motion to dismiss.[6]

---

[6] As our opinion makes clear, petitioner's chief complaint with Dr. Benowitz's and Dr. Halka's opinions is that they were not shown to be sufficiently reliable to justify their admission at the preliminary hearing. However, petitioner additionally claims, "Because Hoffman was unable to answer even basic questions regarding the circumstances under which the experts reached their conclusions, his testimony also deprived petitioner 'of the opportunity to meaningfully cross-examine the testifying officer regarding the circumstances under which the out-of-court statement[s were] made.'" Putting aside the fact that petitioner raised this claim for the first time in his reply brief, we reject it as having a faulty premise. As shown above, Hoffman provided enough background information about Dr. Halka's and Dr. Benowitz's opinions to not only permit their introduction into evidence, but also to allow meaningful cross-examination. Indeed, Hoffman's cross-examination lasted longer and yielded considerably more information than his direct examination.

19

DISPOSITION

The petition for a writ of prohibition/mandate is denied.  The case may now proceed to trial.


BEDSWORTH, ACTING P. J.


WE CONCUR:


MOORE, J.


FYBEL, J.