Opinion
KENNARD, J.
The Sixth Amendment to the United States Constitution grants a criminal defendant the right to confront adverse witnesses. This is the second in a trio of cases before us involving that right. The two companion cases are People v. Lopez (2012) 55 Cal.4th 569, and People v. Rutterschmidt (2012) 55 Cal.4th 650.
At defendant Reynaldo Santos Dungo’s murder trial, a forensic pathologist testifying for the prosecution described to the jury objective facts about the condition of the victim’s body as recorded in the autopsy report and accompanying photographs. Based on those facts, the expert gave his independent opinion that the victim had died of strangulation. Neither the autopsy report, which was prepared by another pathologist who did not testify, nor the photographs were introduced into evidence. Unlike the Court of Appeal, we conclude that the expert’s testimony did not give rise to a right by defendant to question the preparer of the autopsy report.
I
A. Facts
Defendant and Lucinda Correia Pina became romantically involved in 2005. Pina lived in Stockton, San Joaquin County, and was in the process of divorcing her husband. Defendant and his daughter also lived in Stockton, but his wife and son were staying with his wife’s grandparents in Seaside, Monterey County. Defendant’s wife viewed this as a temporary separation, and she talked regularly to defendant, but defendant told Pina that he and his wife were divorced.
In April 2006, defendant’s friends noticed that he was exhibiting “controlling behavior” towards Pina. Pina told friends and relatives that defendant was “smothering her” and she wanted to end their relationship. That same month, defendant, while at Pina’s house, answered a telephone call to Pina from Isaac Zuniga, who had a prior sexual relationship with Pina; defendant *613 threatened to kill Zuniga if he continued to call Pina. Later, on April 14, Zuniga told Pina about the call. That evening, defendant and Pina went to visit Felipe and Angelique Torres. Pina complained to Angelique that defendant had told Zuniga to stop calling her, and Pina said she was considering raising the issue with defendant.
The next morning, defendant went to see Pina’s mother and asked if she knew where Pina was. Defendant said that while he was at Pina’s house the previous night, Pina received a telephone call from Zuniga and then left to meet Zuniga. Pina’s sport utility vehicle (SUV) was not at her house. Pina’s mother then tried repeatedly to reach Pina on her cell phone, without success. That afternoon, the mother called the police.
Local news media reported Pina’s disappearance, and they described Pina and her SUV. Thereafter, a Stockton resident told the police that an SUV matching the description was parked on her street. Police officers found Pina’s body in the vehicle.
The police arrested defendant, and he eventually admitted killing Pina. He said: After he and Pina left the Torres’s home the night of April 14, 2006, they argued at Pina’s home. Pina told him to leave and began throwing some of his belongings in a box. She punched defendant lightly on the chin, pushed him, and threw some children’s toys at him. He grabbed her by the throat and strangled her. He then wrapped her body in a blanket, put it in her SUV, and drove around aimlessly, eventually abandoning the SUV on the Stockton street where the police later found it.
B. Trial Court Proceedings
Defendant was charged with Pina’s murder. Before trial, the prosecution informed the trial court that Pathologist George Bolduc, who had performed the autopsy of Pina’s body, would not be called as an expert witness. Instead, the prosecution’s witness would be Forensic Pathologist Robert Lawrence, who at the time of trial was Dr. Bolduc’s employer.[1] The prosecution did not indicate that Dr. Bolduc was unavailable to testify. Defendant objected to the prosecution’s proposed substitution of its expert witness and asked for an evidentiary hearing on the matter. (See Evid. Code, § 402, subd. (b).) The trial court granted the request.
At the pretrial evidentiary hearing, Dr. Lawrence testified on cross-examination by the defense that Dr. Bolduc had at one point been a coroner *614 in Kem County but “was fired,” a fact not disclosed in Bolduc’s resume. Also, in his previous employment as a coroner for Orange County, Dr. Bolduc had resigned “under a cloud.”[2] As a result of these incidents, Dr. Lawrence said, some newspaper articles asserted that Dr. Bolduc was incompetent, and prosecutors in several counties in California refused to use him as an expert witness in homicide cases. Dr. Lawrence had seen “no evidence that [Dr. Bolduc] ever did anything incompetent.” He said the allegations against Dr. Bolduc were “generated by people who don’t know what they’re talking about,” and he described much of the criticism of Dr. Bolduc as “ridiculous” and “patently absurd.” Dr. Lawrence agreed with the conclusion in Dr. Bolduc’s autopsy report that Pina died from “asphyxia due to neck compression.”
The trial court ruled that at trial the prosecution could have Dr. Lawrence testify about the cause of Pina’s death, but that the defense could cross-examine Dr. Lawrence about Dr. Bolduc’s qualifications as a pathologist, as this was relevant to the trustworthiness of the facts stated in Dr. Bolduc’s autopsy report.
At the jury trial, Dr. Lawrence testified that after reviewing Dr. Bolduc’s autopsy report and the accompanying autopsy photographs, he concluded that Pina had died from asphyxia caused by strangulation. He pointed out that Pina had “hemorrhages in the neck organs consistent with fingertips during strangulation” and that she had “pinpoint hemorrhages in her eyes,” indicating a lack of oxygen. Also supporting strangulation as the cause of Pina’s death, Dr. Lawrence testified, were “the purple color of her face,” the “absence of any natural disease that can cause death,” and the fact that Pina had bitten her tongue shortly before death. Dr. Lawrence stated that because Pina’s hyoid bone was not fractured, Pina was strangled for “more than two minutes.” Had a fracture occurred, Dr. Lawrence explained, death could have occurred sooner.
Dr. Lawrence did not describe to the jury Dr. Bolduc’s opinion about the cause of Pina’s death; instead, he only gave his own independent opinion as a forensic pathologist. Dr. Lawrence did not say whether his description of Pina’s body at the time of the autopsy (the hemorrhages in Pina’s face and eyes, the purplish color of the face, the bite marks on the tongue, and the *615 absence of a fracture of the hyoid bone) was based solely on the autopsy photographs, solely on Dr. Bolduc’s autopsy report, or on a combination of them. Neither the autopsy photographs nor Dr. Bolduc’s autopsy report was admitted into evidence.[3] On cross-examination, defense counsel questioned Dr. Lawrence regarding his views about the cause of Pina’s death, but not about Dr. Bolduc’s qualifications.
Testifying on his own behalf, defendant said that on the night he killed Pina, he told her of his suspicion that she might be resuming her relationship with Isaac Zuniga. Defendant and Pina began swearing at each other, and Pina told defendant: “I’ll fuck whoever I want. ... If I want to fuck Isaac, if I want to fuck Anuí [(Pina’s husband)], I will do whatever I want.” Defendant grabbed Pina’s arm, after which Pina punched him on the chin and bit his arm; saying: “You’re not even a good father. You’re a lousy fucking father . . . you’re a worthless piece of shit.” Defendant “snapped.” He grabbed Pina’s neck and strangled her, saying: “Fuck you, Lucinda. I’m a good dad. I’m a good dad. I’m not a bad father. Fuck you.”
In closing argument, defense counsel conceded defendant’s killing of Pina but argued that the murder was without malice as it occurred in a sudden quarrel or heat of passion, and that therefore defendant was guilty only of voluntary manslaughter, not murder.[4] The prosecutor, citing Dr. Lawrence’s testimony that Pina was strangled for “more than two minutes,” argued that defendant could not have been acting in the heat of passion for that length of time, and that therefore the killing was murder rather than manslaughter.
C. Verdict and Appeal
The jury convicted defendant of second degree murder, and the trial court sentenced him to a prison term of 15 years to life.
The Court of Appeal reversed the judgment. It concluded that Dr. Lawrence’s trial testimony about the cause of Pina’s death violated defendant’s federal *616 Sixth Amendment right to confront and cross-examine Dr. Bolduc, and that the error was prejudicial. We granted the district attorney’s petition for review.
II
Like the two companion cases, this case presents a Sixth Amendment confrontation right issue with complexities that are far from easy to resolve in light of the widely divergent views expressed by the justices of the United States Supreme Court in a recent quartet of cases we must consider here. Those cases are: (1) Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (Crawford), a seven-to-two decision; (2) Melendez-Diaz v. Massachusetts (2009) 557 U.S. 305 [174 L.Ed.2d 314, 129 S.Ct. 2527] (Melendez-Diaz), a five-to-four decision; (3) Bullcoming v. New Mexico (2011) 564 U.S. ._ [180 L.Ed.2d 610, 131 S.Ct. 2705] (Bullcoming), a five-to-four decision; and (4) Williams v. Illinois (2012) 567 U.S._ [183 L.Ed.2d 89, 132 S.Ct. 2221] (Williams), a four-one-four decision.
Well before Crawford, the high court had, in Ohio v. Roberts (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 100 S.Ct. 2531], construed the federal Constitution’s confrontation right as allowing the use at trial of any out-of-court statements that were within a “firmly rooted hearsay exception” or had “particularized guarantees of trustworthiness.” But some 25 years later, in Crawford, the high court abandoned that approach and adopted this general rule: The prosecution may not use “[t]estimonial statements” of a witness who does not appear at trial, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (Crawford, supra, 541 U.S. at p. 59.)
The Crawford majority explained that the Sixth Amendment’s confrontation right pertains to those who give “testimony,” defined as “ ‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ” (Crawford, supra, 541 U.S. at p. 51.) Crawford mentioned several possible definitions, by several sources, of statements that are testimonial in nature, including “ ‘extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,’ [citation]; [and] ‘statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . .’ [citation].” (Id. at pp. 51-52.) But Crawford did not adopt a particular definition, noting only that “some statements qualify under any definition.” (Id. at p. 52.)
*617 Five years later, in 2009, came the high court’s decision in Melendez-Diaz, which extended Crawford's holding to forensic reports. There, at the defendant’s trial for cocaine distribution and trafficking, the prosecution introduced into evidence a laboratory’s “ ‘certificates of analysis’ sworn statements that a substance found in plastic bags in the defendant’s car was determined to be cocaine. (Melendez-Diaz, supra, 557 U.S. at p. 308.) The high court held that the laboratory certificates were “within the ‘core class of testimonial statements,’ ” making them inadmissible under the reasoning of Crawford, supra, 541 U.S. 36. (Melendez-Diaz, supra, at p. 310.) The Melendez-Diaz majority explained; Each certificate was (1) “a ‘ “solemn declaration or affirmation made for the purpose of establishing or proving some fact” ’ ” (ibid.), (2) “functionally identical to live, in-court testimony” (id. at pp. 310-311), (3) “ ‘made under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial’ ” (id. at p. 311), and (4) created “to provide ‘prima facie evidence of the composition, quality, and the net weight’ ” (ibid.) of the substance found in the plastic bags seized from the defendant’s car.
Two years later, in 2011, the high court decided Bullcoming, which involved a charge of driving while intoxicated. At trial, the prosecution introduced into evidence a report by laboratory analyst Curtis Caylor. The report included Caylor’s “ ‘certificate of analyst’ ” (Bullcoming, supra, 564 U.S. at p. _ [131 S.Ct. at p. 2710]) stating the correctness of his report’s conclusion that a blood sample taken at the defendant’s arrest had an illegally high level of alcohol. Caylor did not testify. Instead, the prosecution called as a witness a colleague of Caylor’s—an analyst who, although familiar with the laboratory’s testing procedures, had neither participated in nor observed the testing by Caylor. The high court held that the admission at trial of Caylor’s laboratory report violated the defendant’s right to confront and cross-examine Caylor. The court noted that unlike the laboratory certificates in Melendez-Diaz, supra, 557 U.S. 305, which were statements sworn before a notary public attesting to the truth of the reported test results, Caylor’s certificate was not a sworn declaration. Nevertheless, the high court pointed out, “. . . Caylor’s certificate [was] ‘formalized’ in a signed document . . .” (Bullcoming, supra, 564 U.S. at p._[131 S.Ct. at p. 2717])— the laboratory report—and the report made reference to New Mexico court rules that “provide for the admission of certified blood-alcohol analyses” (ibid.). These “formalities” (ibid.) the high court concluded, were “more than adequate” (ibid.) to qualify Caylor’s laboratory report as testimonial in nature.
In June of this year, 12 days after we heard oral argument in this matter and while it was pending before us, the high court decided Williams, supra, 567 U.S._[132 S.Ct. 2221]. At issue in Williams was testimony by Illinois State Police Forensic Biologist Sandra Lambatos that a DNA profile (derived *618 from semen on vaginal swabs taken from a rape victim) produced by a Maryland laboratory matched a DNA profile (derived from a sample of the defendant’s blood) produced by the Illinois State Police Laboratory.
The plurality opinion in Williams, authored by Justice Alito, was signed by the Chief Justice as well as Justices Kennedy and Breyer; in a separate concurring opinion Justice Breyer explained why he joined Justice Alito’s opinion “in full” (Williams, supra, 567 U.S. at p._[132 S.Ct. 2221, 2252] (cone. opn. of Breyer, J.)). The plurality concluded on two alternative grounds that Lambatos’s expert testimony did not violate the federal Constitution’s confrontation right. First, the plurality reasoned that Lambatos’s testimony was constitutionally permissible because it was admitted not for its truth but only for the limited purpose of explaining the basis of Lambatos’s independent conclusion, based on her expertise, that the defendant’s DNA matched the DNA in the semen found on the vaginal swabs. (567 U.S. at p. _ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) Alternatively, the Williams plurality reasoned, there was no confrontation right violation because the Maryland laboratory’s report was prepared for the primary purpose of finding a dangerous rapist who was still at large, not “for the primary purpose of accusing a targeted individual.” (Id. at p._[132 S.Ct. at p. 2243] (plur. opn. of Alito, J.).) In a separate concurring opinion, Justice Thomas agreed with the plurality’s conclusion that Lambatos’s expert testimony did not offend the Sixth Amendment’s confrontation right, but for a completely different reason: The Maryland laboratory report on which Lambatos relied “lack[ed] the solemnity of an affidavit or deposition” and was therefore not “testimonial.” (Id. at p. _ [132 S.Ct. at p. 2260] (cone. opn. of Thomas, J.).) A dissenting opinion by Justice Kagan, and signed by Justices Scalia, Ginsburg, and Sotomayor, disagreed with the reasoning of both the plurality and Justice Thomas, and concluded that Lambatos’s testimony violated the defendant’s confrontation right. These widely divergent views, none of which was able to gamer majority support—as reflected in the four-one-four decision—highlight the complexity of the issue.
III
We noted earlier that at defendant’s murder trial, Dr. Lawrence gave his independent opinion as to the cause of Pina’s death. Dr. Lawrence reached that opinion after reviewing an autopsy report (with accompanying photographs) prepared by Dr. Bolduc, who did not testify and thus could not be confronted by defendant. The Court of Appeal concluded that Dr. Lawrence’s testimony violated defendant’s right to confront and cross-examine Dr. Bolduc.
Limiting our inquiry are two significant points. First, here (unlike in the companion case of People v. Lopez, supra, 55 Cal.4th 569), Dr. Bolduc’s *619 autopsy report was not introduced into evidence. Thus, we need not decide whether that entire report is testimonial in nature. Second, Dr. Lawrence’s testimony never described the conclusions in Dr. Bolduc’s autopsy report as to the cause of Pina’s death. Thus, we need not determine whether such testimony, if it had been given, would have violated defendant’s right to confront Dr. Bolduc.
Dr. Lawrence did, however, describe to the jury the condition of Pina’s body at the time of the autopsy: the hemorrhages in Pina’s eyes and neck organs, the purple color of her face, the absence of any natural disease causing death, the fact that she had bitten her tongue shortly before death, and the absence of any fracture of the hyoid bone. This description was based on Dr. Lawrence’s review of Dr. Bolduc’s autopsy report and its accompanying photographs. (As we have noted earlier (see pp. 614-615, ante), the record before us does not indicate whether Dr. Lawrence based his description solely on the autopsy photographs, solely on Dr. Bolduc’s autopsy report, or on a combination of the two.) The issue before us is whether Dr. Lawrence’s testimony about these objective facts entitled defendant to confront and cross-examine Dr. Bolduc.
As we discussed in the companion case of People v. Lopez, supra, 55 Cal.4th at page 581, the prosecution’s use of testimonial out-of-court statements “ordinarily violates the defendant’s right to confront the maker of the statements unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination.” Although the high court has not agreed on a definition of “testimonial,” testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution. The high court justices have not, however, agreed on what the statement’s primary purpose must be.
We begin with the issue of formality. An autopsy report typically contains two types of statements: (1) statements describing the pathologist’s anatomical and physiological observations about the condition of the body, and (2) statements setting forth the pathologist’s conclusions as to the cause of the victim’s death. The out-of-court statements at issue here—Pathologist Bolduc’s observations about the condition of victim Pina’s body—all fall into the first of the two categories. These statements, which merely record objective facts, are less formal than statements setting forth a pathologist’s expert conclusions. They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature. (Melendez-Diaz, supra, 557 U.S. at p. 312, fn. 2 *620 [“medical reports created for treatment purposes . . . would not be testimonial under our decision today”].)[5]
Defendant argues that the statements in nontestifying Dr. Bolduc’s autopsy report were sufficiently “formal” because: (1) a detective was present when the autopsy of Pina was performed, (2) the autopsy was statutorily mandated, (3) Dr. Bolduc was required by statute to report his findings, (4) Detective Fain disclosed defendant’s confession to Dr. Bolduc before the autopsy report was written, and (5) Dr. Bolduc was statutorily required to notify law enforcement if he determined that there were reasonable grounds to suspect that the death was a homicide. But those circumstances have little to do with the formality and solemnity of the statements. Rather, they pertain to the second of the two categories mentioned above: the primary purpose of the statements in the report.
For example, the presence of a detective at the autopsy and the fact that the detective told the pathologist about defendant’s confession do not make the statements of objective fact in the autopsy report into formal and solemn testimony; but those circumstances do support defendant’s argument that the primary purpose of the autopsy was the investigation of a crime. Similarly, the fact that the autopsy was mandated by a statute that required public findings and notification of law enforcement does not imply that the statements of objective fact in the report are formal and solemn testimony, but it does imply that the primary purpose of the autopsy was forensic. Therefore, we turn now to the question of primary purpose.
The preparation of an autopsy report is governed by California’s Government Code section 27491, which requires a county coroner to “inquire into and determine the circumstances, manner, and cause” of certain types of death. Some of these deaths (such as deaths from alcoholism, “sudden infant death syndrome,” and “contagious disease”) result from causes unrelated to *621 criminal activities, while other deaths (such as deaths resulting from “criminal abortion,” deaths by “known or suspected homicide,” and “deaths associated with a known or alleged rape”) result from the commission of a crime. {Ibid.) With respect to all of the statutorily specified categories of death, however, the scope of the coroner’s statutory duty to investigate is the same, regardless of whether the death resulted from criminal activity.
The usefulness of autopsy reports, including the one at issue here, is not limited to criminal investigation and prosecution; such reports serve many other equally important purposes. For example, the decedent’s relatives may use an autopsy report in determining whether to file an action for wrongful death. And an insurance company may use an autopsy report in determining whether a particular death is covered by one of its policies. (See, e.g., People v. Rutterschmidt, supra, 55 Cal.4th 650.) Also, in certain cases an autopsy report may satisfy the public’s interest in knowing the cause of death, particularly when (as here) the death was reported in the local media. In addition, an autopsy report may provide answers to grieving family members.
In short, criminal investigation was not the primary purpose for the autopsy report’s description of the condition of Pina’s body; it was only one of several purposes. The presence of a detective at the autopsy and the statutory requirement that suspicious findings be reported to law enforcement do not change that conclusion. The autopsy continued to serve several purposes, only one of which was criminal investigation. The autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial. (Melendez-Diaz, supra, 557 U.S. at p. 324.)
In summary, Dr. Lawrence’s description to the jury of objective facts about the condition of victim Pina’s body, facts he derived from Dr. Bolduc’s autopsy report and its accompanying photographs, did not give defendant a right to confront and cross-examine Dr. Bolduc. The facts that Dr. Lawrence related to the jury were not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment’s confrontation right, and criminal investigation was not the primary purpose for recording the facts in question. In holding that defendant’s confrontation right was violated here, the Court of Appeal erred.
Disposition
The judgment of the Court of Appeal is reversed, and the matter is remanded for further proceedings consistent with this opinion.
Cantil-Sakauye, C. 1, Baxter, 1, Werdegar, L, and Chin, L, concurred.

 At trial, Dr. Lawrence testified to being a pathologist for the San Joaquin County coroner’s office and owning Forensic Consultants Medical Group, which provides pathologists, including Dr. Bolduc, to act as coroners in several counties and also offers private consultation.

 In People v. Beeler (1995) 9 Cal.4th 953 [39 Cal.Rptr.2d 607, 891 P.2d 153], an Orange County capital murder case, Dr. Bolduc performed an autopsy of the murder victim but did not testify at trial. Our opinion affirming the judgment of death mentioned that the trial court in that case “was aware that Dr. Bolduc had apparently left the [Orange County] coroner’s office under unfavorable conditions” (id. at p. 979), and we noted testimony by a pathologist that Dr. Bolduc had caused “ ‘quite a bit of consternation’ in a prior murder case by basing his conclusion regarding the cause of death on a police report rather than on medical evidence” (ibid.).

 We grant the district attorney’s motion, which defendant does not oppose, that we take judicial notice of the autopsy report. (See People v. Castillo (2010) 49 Cal.4th 145, 157 [109 Cal.Rptr.3d 346, 230 P.3d 1132] [a court may take judicial notice of a public record when it does not consider the record for the truth of matters stated therein]; Dixon v. Superior Court (2009) 170 Cal.App.4th 1271, 1278 [88 Cal.Rptr.3d 847] [an autopsy report is a public record].)

 “Murder is the unlawful killing of a human being . . . with malice aforethought.” (Pen. Code, § 187, subd. (a).) When an unlawful killing occurs “upon a sudden quarrel or heat of passion” (Pen. Code, § 192, subd. (a)) the killer lacks malice, and the crime is voluntary manslaughter, a lesser offense necessarily included within the crime of murder. (See People v. Maye (2009) 47 Cal.4th 537, 549 [98 Cal.Rptr.3d 113, 213 P.3d 652].)

 Defendant contends that even if the statements in nontestifying Dr. Bolduc’s autopsy report lacked the requisite formality, the Sixth Amendment’s confrontation right also applies to what Justice Thomas called “ ‘technically informal statements’ ” if those statements were “ ‘used to evade the formalized process.’ ” (Williams, supra, 567 U.S. at p._, fn. 5 [132 S.Ct. at p. 2260, fn. 5] (cone. opn. of Thomas, J.).) Defendant argues that this exception applies here. We need not decide the issue, however. Justice Thomas has made clear, in the language quoted above, that any such exception applies only to the formality requirement for testimonial out-of-court statements. But formality is not enough to make an extrajudicial statement testimonial; the statement must also have a primary purpose pertaining to the investigation and prosecution of a crime. {People v. Lopez, supra, 55 Cal.4th 569, 582 [“all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution” (italics added)].) As we will explain (see text discussion, post), the autopsy statements upon which Dr. Lawrence relied for his opinions had no such primary purpose.