Filed 10/28/13  P. v. Johnson CA3

(4/28/09, first opn. filed; 9/22/09, remittitur recalled and opn. vacated;  9/22/09, opn. filed 4/28/09 refiled;  10/20/09, rehearing ordered;  1/18/11, third opn. filed;  7/3/12, U.S. Supreme Ct. grant of certiorari; 7/31/12, remanded from U.S. Supreme Ct.;  10/28/13, fourth opn. filed.)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C056841 |
| Plaintiff and Respondent, | (Super. Ct. No. 04F10764) |
| v. | OPINION AFTER REMAND BY UNITED STATES SUPREME COURT |
| WILLIAM JAMES JOHNSON, | |
| Defendant and Appellant. | |

A jury convicted defendant William James Johnson of murdering Nora Mini and found to be true two special circumstance allegations, the murder occurred during the commission of rape and the commission of sodomy.  The trial court found defendant had a prior conviction for a sex offense and had served a prior prison term.  Defendant was sentenced to state prison for life without the possibility of parole, plus a consecutive term of five years for the prior conviction enhancement.

1

On appeal, defendant contends (1) the trial court erroneously allowed the introduction of testimony of a DNA expert who did not conduct the DNA testing, (2) the court failed to satisfy its duty of inquiry during a purported *Marsden* hearing (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), (3) the prior sex offense conviction enhancement must be stricken because it is not applicable, and (4) the abstract of judgment must be amended to reflect that the sentence is to be served concurrently with other sentences defendant was then serving.

In a prior opinion, we reversed the true finding on a Penal Code section 667.6, subdivision (a)[1] allegation, struck the consecutive five-year term imposed thereon, modified the judgment to impose a consecutive one-year term for a prior prison term enhancement found to be true, and affirmed the judgment as modified. (*People v. Johnson* (Apr. 28, 2009, C056841) [nonpub. opn.].)

Among other things, we held that defendant's challenge to the DNA expert testimony, as purportedly violating the Sixth Amendment to the United States Constitution as interpreted in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*), failed for reasons stated by the California Supreme Court in *People v. Geier* (2007) 41 Cal.4th 555 (*Geier*).

Defendant petitioned for rehearing, implying that we should no longer follow *Geier* because the subsequent decision in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [174 L.Ed.2d 314] (*Melendez-Diaz*) required reversal of the judgment. We granted the petition, vacated our earlier opinion, and the parties submitted supplemental briefing on the application of *Melendez-Diaz.* At the time, the issue of how *Melendez-Diaz* affected *Geier* was pending before the California Supreme Court in several cases, three of which have now been decided. (*People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*)

---

[1] Undesignated statutory references are to the Penal Code.

[found no violation of the confrontation clause where a forensic pathologist who did not perform the autopsy testified, relying on the autopsy report]; *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*) [found no violation of the confrontation clause where the court received the blood-alcohol report in evidence without the analyst's testimony]; *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*) [claimed violation of the confrontation clause where the chief laboratory director and supervising criminalist testified, rather than the analyst, about a drug analysis was harmless].)

In an opinion on rehearing, this court proceeded to address the issue rather than wait for the California Supreme Court to decide the issue and concluded that *Melendez-Diaz* did not compel reversal of the judgment. (*People v. Johnson* (Jan. 18, 2011, C056841) [nonpub. opn.].) We disposed of the case as this court had done in its initial opinion prior to rehearing. The California Supreme Court denied review. (Mar. 23, 2011, S190602.)

Thereafter, the United States Supreme Court decided *Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89] (*Williams*). Defendant's petition for writ of certiorari was granted and the United States Supreme Court vacated the judgment and remanded to this court for further consideration in light of *Williams*. We requested supplemental briefing from the parties on the application of *Williams*.

Subsequently, the California Supreme Court decided *Lopez, Dungo*, and *Rutterschmidt* and we requested supplemental briefing from the parties on the significance, if any, of these three new decisions by the California Supreme Court. Having considered all the supplemental briefing, we conclude that defendant's Sixth Amendment challenge to the DNA expert testimony as interpreted in *Crawford* and subsequently in *Williams*, fails for reasons stated by the California Supreme Court in *Lopez* and *Dungo*.

# FACTUAL BACKGROUND

About 3:00 p.m. on March 10, 1982, the body of 59-year-old Nora Mini was discovered in her car parked at a Texaco station in Sacramento on Florin Road at 55th Street, where she usually parked at night. Mini had been homeless for years, living out of and sleeping in her car. She was a loner who spoke to few people, collected aluminum cans, and did not panhandle.

Mini had been raped and sodomized; she died from cardiac arrhythmia brought on by the attack, which caused pain from tears to her vagina and anus. The injuries to her vagina and anus were most likely inflicted at or near the time of her death. She had coronary artery disease and scarring from a previous heart attack. She died about 18 to 24 hours prior to a preliminary examination conducted at 5:00 p.m. on March 10, 1982, by Dr. Pierce Rooney. During an autopsy, Dr. Rooney collected forensic swabs from Mini's vagina, rectum, and mouth, and he removed hairs from her body. Mini had abrasions on her cheek and ear, abrasions and a laceration under her chin, trauma to her left hand and right arm, abrasions on her right wrist, and a bruised left hip. There were indications of strangulation, i.e., "zones of hemorrhage" behind her larynx, but not enough evidence to conclude it was the cause of death. Dr. Rooney believed that the tears to Mini's vagina were caused by a knife or piece of glass, or even "violent sex."

The swabs taken from Mini's vagina and rectum revealed the presence of sperm. Eighty percent of the sperm taken from her vagina was intact, meaning there was a head and tail; only one intact sperm was on the rectal swab. The sperm were deposited sometime between 5:00 p.m. on March 9, 1982, and 11:00 a.m. on March 10, 1982.

In 2003, the Sacramento County District Attorney's crime laboratory (Sacramento crime lab) conducted DNA testing on the vaginal swab from Mini, developed a DNA profile, and sent it to the Department of Justice national data bank. It matched defendant's DNA profile in the data bank. A new sample was taken from defendant in

October 2004, and DNA analysis was performed. Defendant's DNA profile matched the DNA profile from both the vaginal swab and rectal swab from Mini. The DNA profile from the vaginal swab occurs "at random among unrelated individuals in one in 140 quintillion of the African-American population," "[o]ne in 59 quintillion of the Caucasian population," and "one in 760 quintillion of the Hispanic population." Based on mitochondrial DNA testing, one of the hairs removed from Mini's entroital area could have originated from defendant.

Defendant had moved to Sacramento in early 1982, when he was 21 years old. Interviewed on October 27, 2004, while in custody in state prison for other crimes, defendant claimed he did not arrive in California until March 28, 1982, and said he stayed with his brother in Rancho Cordova. When shown a photograph of Mini, defendant denied having had sex with her and denied having ever seen her car. When confronted with the DNA evidence, defendant again claimed that he had never had sex with Mini.

The prosecution introduced evidence underlying defendant's conviction for rape of a 16-year-old girl in 1977 in Indiana, while she was home alone with her baby.

Defendant testified as follows at trial. He was 17 years of age when he was convicted and sentenced to prison for raping the 16-year-old girl. After he was released from prison, he came to California. He initially believed that he was not in Sacramento on March 10, 1982, but then admitted he must have been because of the DNA evidence. He did not recognize Mini from the picture shown to him, he denied having sex with a person who looked like her, and he denied being involved in Mini's death. Defendant acknowledged having had only vaginal sex with a woman he met at a midtown liquor store. She told him that she was from either Oklahoma or Oregon. In January 1982, he was convicted of theft in excess of $150. In March 1983, he was convicted of kidnapping

5

with intent to commit robbery and false imprisonment by fear or menace—crimes committed on April 1, 1982. He had been in custody since April 1982.

The defense called Mini's son, who testified that Mini was born in Oklahoma. Shown the coroner's report, defendant testified that it did not indicate where Mini was born.

After the defense rested, the People introduced evidence that Mini's Oklahoma birth certificate had been provided to defendant's attorney. In surrebuttal, defendant claimed that he had not seen the Oklahoma birth certificate.

## DISCUSSION

## I. DNA Expert Testimony

Defendant contends the trial court committed reversible error in allowing the testimony of a DNA expert who did not conduct the DNA testing. Defendant initially conceded that we were required to follow the holding of *Geier*, *supra*, 41 Cal.4th 555, but raised the issue to preserve it for federal review. Because *Geier* was controlling on us (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), we rejected defendant's claim of error. This court granted rehearing, considered the parties' supplemental briefing, and concluded *Melendez-Diaz* did not undermine the holding in *Geier,* noting that four days after filing its opinion in *Melendez-Diaz*, the United States Supreme Court denied certiorari in *Geier*. (*Geier v. California* (2009) 557 U.S. 934 [174 L.Ed.2d 600].) Now, having considered *Williams*, *Lopez*, *Dungo* and *Rutterschmidt*, we conclude that no error occurred in allowing the testimony of a DNA expert who did not conduct the DNA testing.

### A. Background

Prior to trial, defense counsel filed a motion to exclude the DNA evidence, arguing, among other things, that the prosecution's witness, Mary Hansen, was not the

6

Sacramento crime lab analyst who performed the DNA testing (Jeffrey Herbert) and, thus, Hansen's expert testimony would violate defendant's Sixth Amendment right of confrontation as interpreted in *Crawford*, *supra*, 541 U.S. 36 [158 L.Ed.2d 177].

At an Evidence Code section 402 hearing, Hansen testified that she was the supervising criminalist in the biology unit of the Sacramento crime lab and had been working there for more than 22 years in serology, the identification of biological fluids. The majority of the cases were sexual assault cases or homicide with sexual components. She explained (1) semen as one bodily fluid analyzed by the laboratory, (2) the protocol followed for identifying the same, and (3) the reports generated about whether sperm are present. Hansen looked at "some prepared slides" in the Mini case. Herbert did the case work and prepared a report dated December 22, 2005, under Hansen's supervision. Hansen signed the report as the technical reviewer, i.e., the person who reviews the report, the case notes, and the conclusions generated by the primary analyst and then verifies the conclusions. Hansen also reviewed the slides with Herbert, and Hansen conducted the administrative review. Referring to the vaginal swabs, Hansen opined there was a three plus grading, that is, six to 12 sperm per microscopic field and about 80 percent of the sperm were intact. Based on this quality, Hansen opined the semen was deposited a minimum of six to 12 hours, and a maximum of 24 hours, prior to its collection. Since 1998, Hansen had been involved in DNA case work; she not only supervised others, she conducted her own case work. She was involved in supervision, technical review, and administrative review on DNA work conducted in the Mini case; and she had reviewed all of Herbert's bench notes and reports in preparation for Hansen's testimony at the preliminary hearing. Her opinions were based on her review of the work Herbert performed in the case.

On cross-examination, Hansen said she was in the Sacramento crime lab, but not looking over Herbert's shoulder, as he did the work on the case. Hansen was aware of

7

Herbert's knowledge and his qualifications, which is why she assigned the case to him. Hansen was unaware of whether Herbert had any conversations with officers, the district attorney, or anyone else involved in the case, or if he had any knowledge that would have led him to be biased with respect to the outcome. Hansen was aware that Herbert had in the past spoken over a sample, contaminating it with his own DNA. She did not know whether Herbert had been talking to anyone while doing DNA testing in this case. In conducting a technical review and preparing for her preliminary hearing testimony, Hansen analyzed all the data, including the electronic data, to make sure Herbert's conclusions were correct and accurate. As to her qualifications to express an opinion on the time of the deposit of a semen sample, Hansen noted she had taken a semen analysis course from the Serological Research Institute in 1985, had practical application of analyzing thousands of slides, and had testified as an expert about a dozen times about the specific issue and 86 times on bodily fluids identification in general. Hansen agreed with Herbert's assessment of a three plus grading. She agreed that a 1982 forensic science paper mimicked her findings. She explained there is no proficiency test with respect to forming an opinion as to the time period of deposit, and there is no requirement for a validation study. The protocols "deal with the identification and grading of spermatozoa" but not a time period of deposit, which is gained from practical experience. Hansen had 10 people in her unit conducting bodily fluids identifications. She explained that "[t]he occurrence of a grading of three plus with intact sperm is a very rare occurrence in the laboratory."

The trial court ruled that Hansen's testimony could be introduced at trial because it is not testimonial under *Crawford*.

Hansen then testified before the jury in the same way she had testified at the Evidence Code section 402 hearing with respect to her employment at the Sacramento crime lab. She expounded on her training and experience with bodily fluids and DNA

8

identification. At the time of trial, she had 12 people, including Herbert, in her unit. Hansen trained other professionals about DNA, including deputy district attorneys. She had previously qualified as an expert in forensic biology about 86 times, including bodily fluids identification and conventional serology. In the area of DNA testing, she had qualified as an expert in both polymerase chain reaction testing and the current short tandem repeats (STR) testing. Her expertise in DNA included statistical significance of DNA results.

Hansen testified that the Sacramento crime lab is an accredited laboratory which has procedures conforming with accepted and standard procedures in the field of forensic DNA testing and complying with federal guidelines. She explained the protocols in place to maintain a chain of custody in performing DNA testing. She reviewed Herbert's work and found him to be a competent analyst who sometimes makes a mistake. She also reviewed the work of criminalists Christy Abbott and Joy Byray. Hansen had reviewed the work involving the Mini case. She explained DNA and procedures followed in STR analysis, including DNA extraction from the bodily fluids, amplification, typing, and interpretation. Hansen reviewed Herbert's DNA work in the Mini case, including the records he generated at or near the time of the testing analysis, and she signed the reports. The forms included Herbert's handwritten notes and other data, including the electropherogram, which is a printout of analyzed DNA data depicting genetic markers or locations on the DNA profile.

Hansen explained that in the Mini case, there were 15 different markers. Beginning work on September 11, 2003, Herbert developed a DNA profile from the vaginal swab sample, using a differential extraction, "separat[ing] out sperm cell DNA from epithelial cell DNA which is primarily from the vaginal cavity, the epithelial cells [(E-cells)]." The E-cells came from Mini. Herbert sent the DNA major male profile

9

from the sperm fraction to the Department of Justice national data bank. At the time, Herbert did not have anyone to compare with the profile.

The Department of Justice notified the Sacramento crime lab that there was a "cold hit," forwarded identifying information for the person, and recommended that a new reference sample be obtained and analyzed. A new reference sample was obtained from defendant. Herbert performed the DNA analysis and recorded his observations, preparation, and results. Hansen testified that Herbert followed the laboratory's protocol and that Hansen reviewed Herbert's records. She also reviewed the raw data electropherograms herself. She testified that the notes and records of the analyst were for the purpose of ensuring accuracy of the testing. Herbert developed a DNA profile and compared defendant's DNA profile with the DNA profile of the sperm donor from the vaginal swab. Hansen opined that the "male donor on the vaginal swab matches the reference profile of [defendant] at every location, at all 15 locations" and that the random match probability frequency for the profile "occurs at random among unrelated individuals in one in 140 quintillion of the African-American population," "[o]ne in 59 quintillion of the Caucasian population," and "one in 760 quintillion of the Hispanic population."

With respect to the rectal swab taken from Mini and Herbert's analysis, Hansen opined that the donor of the sperm cell fragment matched the reference sample of defendant, and the E-cells matched Mini's reference profile. The oral swabs matched Mini and no one else.

Hansen also opined that based on the three plus grading, i.e., six to 12 sperm per field examined under the microscope with about 80 percent intact, the semen was deposited in Mini's vaginal cavity at a minimum of six to 12 hours, and no more than 24 hours, from the time it was collected, i.e., between 5:00 p.m. on March 9, 1982, and 11:00 a.m. on March 10, 1982.

10

On cross-examination, Hansen admitted that the 15-loci profile could not alone explain when the DNA was deposited, and she agreed there was very little DNA from the rectal swab, in that Herbert had to combine two swabs to obtain the profile. Hansen explained that her opinion regarding the time period for deposit of the semen in Mini's vaginal cavity was based in part on an article from Forensic Science International dated 1982. Hansen conceded that there were several articles written about the issue and a range of time periods and that she received no swabs of fluids taken from inside the car.

### B. Analysis

*Crawford* held that out-of-court "testimonial" statements, such as "[s]tatements taken by police officers in the course of interrogations," are barred by the Sixth Amendment's confrontation clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. (*Crawford*, *supra*, 541 U.S. at pp. 38, 42, 51-52, 59, 68 [158 L.Ed.2d at pp. 184, 187, 193, 197, 203].) *Crawford* did not define "testimonial" but did state the following: " 'Testimony,' . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement. [¶] Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially'; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions' [citation]; 'statements that were made under circumstances which would lead an objective witness

11

reasonably to believe that the statement would be available for use at a later trial.' " (*Id.* at pp. 51-52 [158 L.Ed.2d at pp. 192-193].)

The issue in *Melendez-Diaz* was whether certificates of analysis, sworn before a notary public (affidavits) and stating that the substance seized from the defendant was cocaine, were testimonial statements. The affidavits, created to serve as evidence at trial, "reported the weight of the seized bags and stated that the bags '[h]a[ve] been examined with the following results: The substance was found to contain: Cocaine.' " (*Melendez-Diaz, supra*, 557 U.S. at p. 308 [174 L.Ed.2d at p. 320].)

*Melendez-Diaz* held "the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial *and* that [the defendant] had a prior opportunity to cross-examine them, [the defendant] was entitled to ' "be confronted with" ' the analysts at trial." (*Melendez-Diaz, supra*, 557 U.S. at p. 311 [174 L.Ed.2d at p. 322].) In other words, "[t]he Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits, and the admission of such evidence . . . was error." (*Id.* at p. 329 [174 L.Ed.2d at p. 332].)

In *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [180 L.Ed.2d 610] (*Bullcoming*), the defendant was convicted of aggravated driving while intoxicated. (*Id.* at p. ___ [180 L.Ed.2d at pp. 617-618].) A certificate signed by a laboratory analyst that the defendant's blood-alcohol concentration was 0.21 grams per 100 milliliters, created solely for use at trial, was introduced into evidence by the prosecution as allowed under New Mexico law. (*Id.* at pp. ___ [180 L.Ed.2d at pp. 616-618, 623, 624].) The analyst who tested the blood sample did not testify at trial. Instead, another analyst, who did not sign the certificate or participate in or observe the test, testified about the lab's testing device and procedures but offered no opinion about—just read—the defendant's test results. (*Id.* at pp. ___ [180 L.Ed.2d at pp. 616-619, 629].) Even though the certificate

12

was not sworn before a notary public as in *Melendez-Diaz*, *Bullcoming* held that the certificate was " 'formalized' in a signed document" that "referr[ed] to municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses." (*Id.* at p. ___ [180 L.Ed.2d at pp. 623-624].) *Bullcoming* found that the certificate was testimonial and inadmissible unless the analyst who performed the test was unavailable for trial and the defendant had a prior opportunity to confront and cross-examine that analyst. (*Id.* at p. ___ [180 L.Ed.2d at pp. 616, 619].)

In *Williams, supra*, 567 U.S. ___ [183 L.Ed.2d 89] (plur. opn. of Alito, J.), the defendant was convicted of, inter alia, aggravated sexual assault. (*Id.* at p. ___ [183 L.Ed.2d at pp. 100, 102].) A state police lab forensic expert testified that analysts from an outside lab (Cellmark) produced a DNA profile from semen on vaginal swabs taken from the victim. Cellmark sent a report with the profile to the police lab. (*Id.* at p. ___ [183 L.Ed.2d at pp. 100, 101].) The defendant's DNA profile was obtained when he was arrested on an unrelated crime. (*Id.* at p. ___ [183 L.Ed.2d at p. 100].) The expert opined that the Cellmark profile and the defendant's DNA profile matched. (*Id.* at p. ___ [183 L.Ed.2d at p. 101].) A Cellmark analyst did not testify and the Cellmark report was not introduced into evidence. (*Id.* at p. ___ [183 L.Ed.2d at pp. 100, 101].) A plurality opinion concluded the evidence was not "testimonial." The out-of-court statements related by the expert to explain the assumptions for her opinion were not offered for their truth and thus did not violate the confrontation clause. (*Id.* p. ___ [183 L.Ed.2d at p. 99].) In the alternative, the Cellmark report was not "testimonial" because it was not prepared for the primary purpose of accusing a targeted individual but to find a rapist at large, noting that the defendant had not been identified as a suspect when the report was produced. (*Ibid.*) Concurring in the result, Justice Thomas rejected the plurality's reasoning and concluded that the Cellmark report "lacked the requisite 'formality and solemnity' to be considered ' "testimonial." ' " (*Id.* at p. ___ [183 L.Ed.2d at pp. 129,

13

133-134].) The dissent concluded the evidence constituted inadmissible testimonial hearsay, agreeing with Justice Thomas's criticism of the plurality but disagreeing with his conclusion that the report was admissible. (*Id.* at p. ___ [183 L.Ed.2d at pp. 138, 139, 142-143, 147-148, 151] (dis. opn. of Kagan, J., joined by Scalia, Ginsburg, and Sotomayor, JJ.).)

In *Lopez*, *supra*, 55 Cal.4th 569, the defendant was charged with vehicular manslaughter while intoxicated. (*Id.* at p. 573.) At trial, the prosecution introduced a laboratory analyst's report that the defendant's blood-alcohol content was 0.09 percent. (*Id.* at pp. 573, 574.) The analyst who prepared the report did not testify at trial. (*Ibid.*) Instead, another analyst testified about the lab's testing procedures for blood alcohol about which he was familiar, reviewed the report and the defendant's test results, and reached the same conclusion, that is, the defendant's blood-alcohol content was 0.09 percent. (*Id.* at p. 574.) The report and testimony were admitted into evidence over the defendant's objection. (*Ibid.*) Finding no error, *Lopez* concluded the "critical portions of that report were not made with the requisite degree of formality or solemnity to be considered testimonial." (*Id.* at p. 582.) Distinguishing *Melendez-Diaz* and *Bullcoming*, *Lopez* noted that the report was not sworn to before a notary by the testing analysts nor was it formalized in a signed document which referred to court rules providing for its admissibility. (*Id.* at pp. 584-585.)

In *Dungo*, *supra*, 55 Cal.4th 608, the defendant was convicted of murder. (*Id.* at p. 615.) An expert (forensic pathologist) opined as to the cause of death based on an autopsy report that was not introduced into evidence. (*Id.* at pp. 613-615.) The report contained objective facts observed and recorded by another pathologist who did not testify. (*Id.* at pp. 618-619.) *Dungo* did not find any violation of the defendant's right to confrontation because observations recorded in an autopsy report are not testimonial,

14

lacking the requisite formality (*id.* at pp. 619-620, 621), and autopsy reports do not have the primary purpose of targeting an accused individual (*id.* at pp. 620-621).

*People v. Holmes* (2012) 212 Cal.App.4th 431 did not find any violation of the defendant's right to confrontation, holding that the forensic data and reports relied on by DNA experts were not "sufficiently formal to be testimonial." (*Id.* at pp. 433, 434, 436, 438-439.) The data and reports were "unsworn, uncertified records of objective fact" and "lacked formality." (*Id.* at p. 438.) None of the experts, who were supervising criminalists, personally performed any of the DNA tests and "reached his or her own conclusions based, at least in part, upon the data and profiles generated by other analysts." (*Id.* at p. 434.)

*People v. Barba* (2013) 215 Cal.App.4th 712 (*Barba*) held that the defendant's confrontation right was not violated, finding that four DNA reports by Cellmark relied on by an expert, the director of a Cellmark lab in Maryland, lacked the requisite formality and solemnity and the primary purpose of the reports was not to accuse a targeted individual. (*Id.* at pp. 718-720, 742-743.)

## C. Conclusion

We conclude that Hansen's testimony was not "testimonial." Herbert's report of his findings was not introduced into evidence. Contrary to defendant's claim, Herbert's bench notes and report that formed, at least in part, the basis of Hansen's testimony lacked the requisite degree of formality or solemnity to be considered testimonial. (*Lopez*, *supra*, 55 Cal.4th at p. 582.) While Herbert's bench notes and report were used by Hansen as basis evidence for her expert opinion (treated as factual and admitted for their truth), defendant's confrontation right was not implicated because Herbert's statements were not "testimonial" under *Crawford*. There is no evidence that the bench notes and report were sworn before a notary as in *Melendez-Diaz* or were signed

15

documents that referred to court rules expressly providing for their admissibility as in *Bullcoming*. (*Lopez*, *supra*, 55 Cal.4th at pp. 584-585.)

Despite defendant's reliance upon *Bullcoming*, Hansen reviewed Herbert's bench notes and report and expressed *her opinion* as to the DNA analysis and the "cold hit" identifying defendant, unlike the analyst who merely read the test results and expressed *no opinion* in *Bullcoming*. Hansen testified that she personally analyzed the DNA profiles. Her conclusions were based on her own analysis. Defendant had an opportunity to cross-examine a live witness unlike the defendant in *Melendez-Diaz*. (*Melendez-Diaz*, *supra*, 557 U.S. at p. 320 [174 L.Ed.2d at p. 327].) Further, Hansen explained the procedures in DNA testing. There was no explanation of the testing in *Melendez-Diaz*. (*Ibid*.)

Hansen reviewed the electropherogram, a printout of analyzed DNA data depicting genetic markers or locations on the DNA profile. *Lopez* held that "machine-generated printouts . . . did not implicate the Sixth Amendment's right to confrontation," citing with approval federal appellate court opinions which have found that printouts are not statements and the machines are not declarants. (*Lopez*, *supra*, 55 Cal.4th at p. 583.) Likewise, machine-generated DNA profiles do not implicate the Sixth Amendment right of confrontation.

In the alternative, like the Cellmark report in *Williams* and the autopsy report in *Dungo*, Herbert's bench notes and report were not prepared for the primary purpose of targeting an accused individual. (*Williams*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 99]; *Dungo*, *supra*, 55 Cal.4th at pp. 620-621.) Defendant was not a suspect when Herbert developed a male DNA profile from the vaginal swabs taken from the victim, which resulted in the "cold hit" from the Department of Justice identifying defendant. (*Williams*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 99]; and see *Barba*, *supra*, 215 Cal.App.4th at pp. 738-740 [the absence of targeted individual not required by

16

*Williams*].)  Further, Herbert's bench notes recorded objective facts.  (*Dungo*, *supra*, 55 Cal.4th at p. 619.)  Hansen's testimony did not violate defendant's Sixth Amendment right to confrontation.

Defendant claims there was no limiting instruction regarding the jury's consideration of any part of Hansen's testimony and that the jury was instructed that the basis evidence was admitted for its truth.  Defendant's claim of instructional error for the first time on appeal is forfeited.  There was no objection to CALCRIM No. 332 on the evaluation of expert testimony or any request for modification.[2]  Even on the merits (§ 1259 [permitting appellate review of instruction even in absence of objection where a defendant's substantial rights are affected], defendant cannot establish error in view of our foregoing conclusions; the instruction properly informed the jury on the manner in which to evaluate an expert's opinion and did not affect defendant's substantial rights.

## II.  *Marsden* **Motion**

Defendant next contends the trial court failed to satisfy its duty of inquiry under *Marsden*, and the matter must be remanded for further hearing on the *Marsden* motion.  We find no reversible error.

---

[2]  The trial court instructed the jury in the language of CALCRIM No. 332 as follows: "Witnesses are allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or [correct].  The meaning and importance of any opinion are for you to decide.  In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate.  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

17

### A. Background

On the date set for sentencing, the trial court conducted what it called a *Marsden* hearing. Noting that defendant had retained his attorney, the court advised defendant that if the *Marsden* motion was denied, his attorney would remain on the case, and that if defendant still did not want his attorney, he could represent himself. The court stated tentatively that it would not grant a continuance of the case. Defendant said he wanted new counsel to pursue a motion for a new trial. He identified numerous complaints about defense counsel and cited legal principles and headnotes to decisional authority. Defense counsel responded to some of defendant's complaints.

Concluding defendant's attorney had made a "superb argument," the court stated that defense counsel's performance had not fallen below the standard expected of a competent attorney and that "the only conclusion that I draw from all of this is that it is for purposes of delay."

The court then told defendant that he could "fire" his attorney if he wanted to. Defendant did so.

When the court reiterated it would not continue the proceeding, and said it would not appoint new counsel to represent defendant (since the so-called *Marsden* motion was made solely for the purpose of delay), defendant confirmed that he wanted to proceed with the hearing representing himself.

After going through with defendant the points he had raised as the basis for seeking a new trial, the court ruled: "The motion for new trial is denied."

### B. Analysis

The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15 of California's Constitution guarantee the right to counsel. "The right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing.' " (*People v. Courts* (1985) 37 Cal.3d 784, 789.)

18

The procedure specified by *Marsden* for discharging appointed counsel and appointing new counsel for an indigent defendant does not apply when defense counsel has been retained. (*People v. Ortiz* (1990) 51 Cal.3d 975, 986 (*Ortiz*).) This is so because "[t]he right of a nonindigent criminal defendant to discharge his retained attorney, *with or without cause*, has long been recognized in this state." (*Id.* at p. 983, italics added.)

"A nonindigent defendant's right to discharge his retained counsel, however, is not absolute. The trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice.' " (*Ortiz*, *supra*, 51 Cal.3d at p. 983.)

Defendant wisely does not claim the trial court should not have allowed him to discharge retained counsel, or that the court should have appointed counsel for him after he discharged retained counsel, or that defendant should have been granted a continuance to retain new counsel, or that he was inadequately advised about representing himself, or that retained counsel rendered ineffective assistance. Such contentions would fail in light of the record in this case.

"Defendant simply claims the trial court failed to perform its duty to inquire at the *Marsden* hearing. The contention lacks merit because the court had no duty to conduct a *Marsden* inquiry in that defendant was represented by retained counsel. (See *Ortiz*, *supra*, 51 Cal.3d at p. 986.) Defendant suggests that by nonetheless electing to conduct a *Marsden* hearing, the court was required to make the inquiry required by *Marsden*. We disagree. Indeed, a *Marsden* inquiry was not appropriate because defendant had the right to discharge his appointed counsel with or without good cause. (*Ortiz*, *supra*, 51 Cal.3d at p. 986.)

Although the trial court should not have conducted a *Marsden* hearing, defendant was invited to discharge his retained attorney and did so. Thus, there was no reversible error.

### III. Sex Crime Enhancement

Defendant correctly contends that the trial court erred in imposing a section 667.6, subdivision (a) enhancement because the enhancement does not apply to a conviction for murder with rape and sodomy special circumstances.

Section 667.6 states in pertinent part: "(a) Any person who is convicted of an offense specified in subdivision (e) and who has been convicted previously of any of those offenses shall receive a five-year enhancement for each of those prior convictions."

Subdivision (e) provides that a section 667.6, subdivision (a) enhancement "shall apply to the following offenses: [¶] (1) Rape, in violation of paragraph (2), (3), (6), or (7) of subdivision (a) of Section 261. [¶] (2) Spousal rape, in violation of paragraph (1), (4), or (5) of subdivision (a) of Section 262. [¶] (3) Rape, spousal rape, or sexual penetration, in concert, in violation of Section 264.1. [¶] (4) Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d) or (k), of Section 286. [¶] (5) Lewd or lascivious act, in violation of subdivision (b) of Section 288. [¶] (6) Continuous sexual abuse of a child, in violation of Section 288.5. [¶] (7) Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d) or (k), of Section 288a. [¶] (8) Sexual penetration, in violation of subdivision (a) or (g) of Section 289. [¶] . . . [¶] (10) . . . an offense committed in another jurisdiction that includes all of the elements of an offense specified in this subdivision."

Thus, the offenses listed in subdivision (e) of section 667.6 are all sex crimes, including rape and sodomy. They do not include the crime of murder, for which defendant was convicted.

Nonetheless, the People argue that the enhancement should apply because defendant was charged with murder with two special circumstances: The victim was murdered during the commission of rape and during the commission of sodomy, which are sex offenses listed in subdivision (e) of section 667.6. In the People's view, the intent of the Legislature in enacting section 667.6 to penalize recidivist sex offenders would be thwarted if the enhancement is found not to apply. We disagree.

The fundamental rule of statutory construction is to discern legislative intent and effectuate it. In determining legislative intent, we look to the language of the statute. "When the language is clear and unambiguous, there is no need for construction." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007-1008.)

By the plain meaning of its terms, the five-year enhancement of section 667.6 applies when a defendant is "convicted" of a sex offense specified in subdivision (e) of the section and previously has been convicted of any of these sex offenses.

Here, defendant was not charged with or convicted of the crime of rape or sodomy, which would have been subject to a statute of limitations claim. Rather, he was charged with, and convicted of, murder committed during rape and sodomy—which does not constitute separate charges and convictions for murder, rape, and sodomy. (See *People v. Williams* (1988) 44 Cal.3d 883, 925-927 & fn. 22.) If the Legislature had intended the section 667.6, subdivision (a) enhancement to apply to such a murder, it would have explicitly included in subdivision (e) the crime of murder committed with said special circumstances. It did not, and we have no authority to write into the statute something left out by the Legislature. Indeed, the Legislature may have recognized it is unnecessary to attach a five-year sentencing enhancement to a crime punishable by life without the possibility of parole.

Because the five-year enhancement does not apply, we must modify the judgment by striking that finding and sentence.

21

We note however that, citing *People v. Jones* (1993) 5 Cal.4th 1142 at pages 1144-1145 and 1153, the trial court did not impose the one-year prior prison term enhancement (§ 667.5, subd. (b)) because it had imposed the section 667.6 five-year enhancement for the conviction that was the basis for the prior prison term. (See also *People v. Flournoy* (1994) 26 Cal.App.4th 1695, 1700-1702.) Since the trial court made clear it would have imposed a consecutive one-year enhancement had it not been for the five-year enhancement, we shall modify the sentence to include the section 667.5, subdivision (b) enhancement.

## IV. Sentencing

Lastly, defendant contends, and the People concede, that the trial court did not specify whether the term of life without the possibility of parole for the special circumstances murder was to be served consecutively or concurrently with the life sentence that defendant was already serving; thus, the abstract of judgment must be amended to reflect that the sentence imposed in this case is to be served concurrently with the existing prison term. (§ 669.)

## V. Presentence Credits

Pursuant to this court's miscellaneous order No. 2010-002, filed March 16, 2010, we deem defendant to have raised the claim that amendments to section 4019, effective January 25, 2010, apply retroactively to his pending appeal and entitle him to additional presentence credits. However, the amendments do not apply to him because he was convicted of a violent and serious felony. (§§ 1192.7, subd. (c)(1), 667.5, subd. (c)(1), former 4019, subds. (b), (c) [Stats. 2009-2010, 3d Ex. Sess., ch. 28, § 50], 2933 [as amended by Stats. 2010, ch. 426, § 1, eff. Sept. 28, 2010].)

## DISPOSITION

The true finding on the section 667.6, subdivision (a) allegation is reversed, the consecutive five-year term imposed thereon is stricken, and the judgment is modified to impose a consecutive one-year term for the section 667.5, subdivision (b) enhancement found to be true.  As modified, the judgment is affirmed.  The trial court is directed to (1) amend the abstract of judgment accordingly, (2) further amend the abstract to reflect that the term of life without the possibility of parole for the murder with special circumstances is to run concurrently with the term then being served by defendant, and (3) send a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.


                BUTZ                , J.


We concur:


        NICHOLSON       , Acting P. J.


        HULL           , J.