Filed 2/23/15  P. v. White CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>JOSEPH M. WHITE,<br><br>        Defendant and Appellant. | F066586<br><br>(Super. Ct. No. BF135958A)<br><br>**OPINION** |

-ooOoo-

        APPEAL from a judgment of the Superior Court of Kern County.  Steven M. Katz, Judge.

        Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Clara M. Levers and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Joseph M. White was convicted by jury of first degree murder (Pen. Code,[1] § 187, subd. (a)). As a result, the trial court sentenced defendant to a prison term of 25 years to life.

On appeal, defendant contends the trial court's admission of evidence relating to the condition of the victim's body at the time of the autopsy violated his right to confront and cross-examine witnesses against him where the doctor who made the observations did not testify at trial. We conclude defendant's constitutional rights were not violated and affirm the judgment.

## FACTS

Laquisha Stevenson was a close friend of the victim Rodney Herbert, and the two lived in the same apartment complex. On the morning of June 3, 2010, Stevenson observed defendant and the victim arguing by the victim's apartment. Approximately 15 minutes later, she saw defendant leave the apartment complex. Later that evening, she saw defendant again as he was leaving the victim's home. Defendant had blood on his sleeves. She had a brief conversation with defendant who said. "'I had to hurt this nigga.'" She believed he was referring to the victim. Afterwards, defendant jumped off the second floor and landed into the courtyard. In a later interview, Stevenson told the investigating officer that defendant said he had to "'beat a nigga up'" and he had ransacked the apartment, tied up the victim, and threw him under a bed, although she did not recall at trial making these statements.

Another neighbor and friend of the victim, Lucille (Lucy) Harris,[2] last saw the victim on June 3, 2010, at approximately 5:00 or 5:30 in the afternoon as she was leaving to go watch a basketball game. She noted the victim was outside drinking beer with two

[1]All further references are to the Penal Code unless otherwise indicated.

[2]Because this witness shares the same surname with another witness, we will refer to them by their first names to avoid confusion. No disrespect is intended.

men, specifically, defendant and another man she had seen visiting with the victim in the past.

Kim Harris, Lucy's sister, also lived at the same apartment complex, in the apartment directly underneath the one occupied by the victim. Kim was home ill on the day in question. That evening she heard noise coming from the victim's apartment, including someone saying, "'leave the old man alone'" and "'it[']s not worth it.'" From the conversation and the voices she heard, she believed there were three people in the victim's apartment. She heard some references to drugs and also heard what sounded like a fight in the kitchen. At one point, Kim heard the victim tell someone to leave his house and then she heard a door slam.

Shortly thereafter she heard what sounded like a door being pushed or kicked in, stomping, and things falling in the apartment. The ordeal lasted for some time. At one point Kim heard the victim call out for help, and she heard a loud thump that sounded like someone's head hitting the ground. The noise appeared to be coming from the victim's bedroom. She also heard what sounded like someone putting a bed together or flipping a mattress. The noise stopped shortly before 7:00 p.m. Afterwards she heard the sound of running water in the bathroom, which continued throughout the night and into the next morning. Shortly after the noise stopped, defendant knocked on her door, apologized for the noise, and asked her not to call the police.

Cedric Grissom was a friend of the victim's. On the day in question, Grissom went to the victim's home sometime after noon. Grissom noted that defendant was already at the victim's apartment, drinking. While visiting, he asked the victim if he would like something to drink and then he and defendant went to the liquor store and bought some alcohol and returned to the victim's apartment. The men continued talking and drinking and at one point Grissom returned to the store to buy more alcohol.[3]

---

[3]Video from the liquor store surveillance camera confirmed the two trips to the liquor store.

Grissom described defendant's behavior as strange; he was inserting himself into Grissom and the victim's conversation, and he appeared angry or frustrated. Defendant appeared to grow more agitated throughout the visit. Grissom recalled defendant talking about military service in Iraq as well as prior gang affiliations. After Grissom returned to the apartment the second time, he believed defendant and the victim were smoking drugs in the bathroom and then the two began to argue.

While the two were arguing, Grissom told them to stop and defendant grabbed him by the neck, took his hat and glasses, and told him to stay out of it. After that, Grissom left. Grissom testified he was not paying attention to what they were arguing about, but believed it could have been about drugs. He believed he might have told defendant to leave "the old man alone" at some point. When he left, defendant and the victim were still arguing. Grissom admitted telling the detectives defendant and the victim were arguing over drugs and that the victim was upset with defendant because defendant was using the drugs but did not pay for them. The victim's apartment was not in disarray when he left; rather, everything was well kept.

Grissom suffered a prior felony conviction for burglary in 2002.

Nathaniel Parker testified he observed defendant get onto a bus later that evening. Defendant told Parker he had "'already beat one nigga.'" Parker, who also knew the victim, noticed defendant was wearing a pair of shoes that looked like the victim's due to the distinctive way he wore his shoes. Video footage from the bus surveillance established defendant entered the bus on June 3, 2010, at 7:57 p.m. In the video, defendant is seen wearing a shirt belonging to the victim that had been given to him by his sister.

The following morning, Stevenson thought it was unusual that she did not see the victim outside playing his music, so she and Lucy went to the victim's apartment to check on him. From the door the two could hear music, but there was no answer. They

4.

called the victim's sister who subsequently called the police. Thereafter the authorities entered the apartment.

Kern County Sheriff's Deputy Joshua Cain received a call to check on the victim's welfare on June 4, 2010, at approximately 10:00 a.m. After speaking with Lucy, he contacted the fire department and an ambulance to assist. Members of the fire department were able to open a window. The interior of the apartment was in disarray. Additionally, the sounds of music and running water could be heard within the apartment. Deputy Cain entered the apartment and in the disordered bedroom discovered the victim underneath a mattress that had been partially pushed off the bed. The victim's hands and feet were bound and he had clothing wrapped around his face. A scarf was tied around his neck. The victim was deceased.

Criminalist Jeanne Spencer responded to document the crime scene. She noted the apartment was in disarray and some furniture had been overturned and disturbed. The victim was bound, by the arms and feet, to the bed railing. Drug paraphernalia was discovered on the bedroom floor. A broken kitchen knife was found in the kitchen.

Spencer noted shoe prints and bloodstains throughout the apartment. The shoes the victim was wearing did not match the shoe prints in the apartment. However, she found a pair of shoes in the apartment that seemed to match those shoe prints. These shoes tested positive for the presence of blood. Subsequent DNA testing on the shoes revealed at least three DNA profiles as to the wearer of the shoe. Defendant was a possible contributor to the wearer mixture.[4] The test was inconclusive as to the victim and Grissom. Further testing revealed the victim's blood was found on the outside of the shoes.

Dr. Eugene Carpenter, Jr., a retired medical examiner coroner, testified regarding the victim's cause of death. The autopsy was performed by Dr. Lesley Wallis.

---

[4]The probability of a random person matching the sample was 1 in 520 quadrillion for Caucasians, 1 in 310 quadrillion for African-Americans, and 1 in 460 quadrillion for Hispanics.

Dr. Carpenter reviewed the coroner's file—which included the investigator report, the autopsy report prepared by Dr. Wallis, the toxicology report, and the photographs of the victim's body—and opined the victim died from blunt force trauma. Specifically, the victim suffered potentially lethal injuries in three areas: his head, his chest, and his throat. The injuries to the victim's head were evidenced by bleeding beneath the scalp. Although the victim did not suffer from skull fracture or brain swelling, his body displayed severe signs of blunt force head trauma consistent with multiple blows to both sides of his head. In addition to the head trauma, the victim suffered jaw fractures, chest injuries comprising seven rib fractures on the right side of his rib cage, and blunt force trauma to the throat and neck. In order to receive the chest injuries, the victim must have suffered some sort of moderate to severe chest compression. The victim also had significant bleeding in the muscles of the throat indicating the trauma. Additionally, the autopsy showed the horns of the thyroid cartilage of the larynx were broken. These horns are broken through severe compression. The horns keep a person's throat open and allow a person to breathe.

Dr. Carpenter described the injuries to the victim's head, throat and chest as major injuries, each of which could potentially be lethal on its own. Additionally, he had several wounds across his face and hands consistent with defensive wounds. Ligature marks were around his wrists and ankles.

Dr. Carpenter noted the victim was 57 years old at the time of his death and had a moderate to severe obstruction of his major coronary arteries. The victim's heart was also enlarged, consistent with heart disease and chronic high blood pressure. Although the victim's condition may have made him frail, Dr. Carpenter did not consider his heart condition as part of the cause of death. This is because the injuries he sustained were lethal and the victim's heart condition would have only reduced his tolerance of the injuries. In Dr. Carpenter's opinion, the injuries suffered by the victim were sufficiently lethal to kill a person in good health. Although it is possible the victim could have had a

6.

heart attack due to the struggle, in Dr. Carpenter's opinion, the victim died from the trauma. Therefore, Dr. Carpenter classified the victim's death as a homicide, meaning his death was caused by another. While the head injury, the chest injury, and the neck injury each had the potential to be lethal individually, the neck injury indicated the victim suffered from a compression of the throat that cut off the blood supply to his brain and caused his death.

### Defense Case

Defendant testified on his own behalf. At the time in question he was 37 years old, six feet and one inch tall, and weighed 189 pounds. He had known the victim for approximately five months prior to the incident. The two visited approximately twice a month at the victim's apartment and smoked rock cocaine.

On the day in question, defendant visited the victim and talked. Later, a drug dealer came by and defendant bought $50 worth of drugs. Although the victim did not pay for the drugs, defendant and the victim shared them. Sometime later, Grissom arrived. After Grissom arrived, he and defendant went to the liquor store and bought some alcohol. They returned to the victim's home and drank, talked, and listened to music. Grissom later returned to the liquor store to purchase more alcohol. While he was gone, the victim asked defendant for more drugs. Ultimately, defendant and the victim smoked all of the drugs defendant had purchased.

Defendant recalled an argument between the victim and Grissom regarding money Grissom owed the victim. Defendant became involved in the argument because Grissom also owed him money. At one point, defendant put Grissom in a headlock and took his hat and glasses. Afterwards, Grissom left and defendant and the victim argued. According to defendant, the victim was "pumped up" over the previous argument and the two argued for about 15 minutes. The victim also kept asking defendant for more drugs, but defendant replied they were gone.

7.

Defendant went into the bathroom for several minutes and the victim told defendant to give him "'some of that shit.'" As defendant exited the bathroom, he saw the victim holding a knife. Defendant asked what he was going to do with the knife and the victim replied, "'you going to give me some of that shit.'" The victim came at him, and defendant wrestled with him in the hallway. The two struggled over the knife for 15 to 20 minutes. Defendant testified he was not able to get the knife from the victim, but he was not sure what happened to it.

The fight progressed into the bedroom where the two were holding on to each other and trading blows. At one point in the bedroom, defendant got knocked to the ground and began checking himself for injuries. When he looked up, he noticed the victim was holding a hammer. The victim held the hammer over his head and said, "'mother fucker, I'm going to kill you.'" The victim swung the hammer, which defendant grabbed, and the two struggled over the weapon. Defendant was able to get on top of the victim and strike him in his side with his knee. Defendant got the hammer away from the victim and then grabbed his hands and began tying him up. The victim was on the floor and defendant restrained him with whatever he could reach. The victim was alive while he was restraining him. Defendant checked himself for injuries and then changed his shirt and put on a pair of shoes. He checked on the victim again, noted he was alive, and then left. Defendant did not receive any serious injuries in the fight.

After he left, he ran into Donte Langston. He told Langston he had gotten into a fight with the victim and asked Langston to check on him. He also encountered Stevenson, had a brief conversation with her, and then went to the bus stop and got on the bus. Defendant never returned to the victim's apartment. Later he learned he was wanted and he turned himself in.

## DISCUSSION

### Defendant's Confrontation Rights Were Not Violated

The People moved to elicit the expert opinion of Dr. Carpenter, a pathologist, regarding the cause of the victim's death. The original autopsy was performed by Dr. Wallis, who was not available to testify.[5] The People argued a substitute pathologist could testify as to his opinion as to the cause of death after reviewing the original autopsy report and photographs. The prosecutor explained she was not seeking to introduce the original autopsy report or the conclusions of Dr. Wallis. Defense counsel objected to the admission of the substitute pathologist and likewise made a motion in limine to exclude the testimony. Defense counsel argued the admission of Dr. Wallis's testimony would violate defendant's confrontation and due process rights and further argued there was a discovery violation as to Dr. Carpenter's testimony.

The trial court ruled that based upon the California Supreme Court's decision in *People v. Dungo* (2012) 55 Cal.4th 608, the substitute pathologist could testify regarding his opinions, but he could not testify as to Dr. Wallis's conclusions. Additionally, the report itself would not be admissible. The court held an Evidence Code section 402 hearing regarding the discovery issues as to Dr. Carpenter's opinion.

On appeal, defendant contends the trial court erred in allowing Dr. Carpenter, the substitute pathologist, to testify to his conclusion as to the cause of death, which was based upon the information contained in the autopsy report prepared by Dr. Wallis. He contends the information contained within the autopsy report was testimonial and, therefore, he was entitled to confront and cross-examine Dr. Wallis regarding the report. This is because Dr. Carpenter relayed information to the jury regarding the condition of the victim's body at the time of autopsy. As he was unable to test Dr. Wallis's

---

[5]Dr. Wallis had moved out of state and was uncooperative with subpoenas sent by the district attorney's office.

observations through cross-examination, he argues, his confrontation rights were violated. We disagree.

Although the United States Supreme Court has not yet produced an identifiable rule to define testimonial statements, our high court has recently noted the United States Supreme Court opinions have made it clear that in order to be "testimonial," a statement must possess two critical components: (1) it "must have been made with some degree of formality or solemnity," and (2) its "primary purpose pertains in some fashion to a criminal prosecution." (*People v. Lopez* (2012) 55 Cal.4th 569, 581, 582.)

As defendant acknowledges, our Supreme Court in *People v. Dungo* addressed an issue identical to the one defendant raises on appeal, namely, whether a defendant's confrontation rights were violated where a forensic pathologist testified as to the cause of death of the victim utilizing photographs of the victim and facts taken from an autopsy report prepared by a nontestifying pathologist. (*People v. Dungo*, *supra*, 55 Cal.4th at p. 614.) The court rejected the defendant's claim, holding that neither of the two requisite components of a testimonial statement were present. As to the formality prong, the statements contained in the autopsy report—which was not introduced into evidence— were "less formal than statements setting forth a pathologist's expert conclusions" and were akin to a physician's nontestimonial "observations of objective fact" in diagnosing a patient's injury or malady and indicating the appropriate treatment for it. (*Id*. at p. 619.) As to the primary purpose of the report, the court explained "criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of [the victim's] body; it was only one of several purposes." (*Id*. at p. 621.) "The autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial." (*Ibid*., citing *Melendez–Diaz v. Massachusetts* (2009) 557 U.S. 305, 324.) *Dungo* has been followed by our Supreme Court in *People v. Edwards* (2013) 57 Cal.4th 658, 705-707 and *People v. Rodriguez* (2014) 58 Cal.4th 587, 643-644, and in the Court of Appeal (*People v. Huynh* (2012) 212 Cal.App.4th 285, 320-321

10.

[nurse's testimony based upon photographs taken by another nurse at a sexual assault exam did not violate confrontation clause]).

The facts of this case are virtually indistinguishable from those in *Dungo*. Dr. Carpenter testified as to his independent opinion regarding the victim's cause of death. In reaching that opinion, he relied upon Dr. Wallis's observations as to the condition of the body during the autopsy. Importantly, Dr. Carpenter did not relay Dr. Wallis's statements regarding her conclusions as to the cause of death, and the autopsy report itself was not admitted into evidence. While Dr. Carpenter did relay Dr. Wallis's observations regarding the condition of the victim's body to the jury, those statements were not testimonial for the reasons set forth in *Dungo*. Therefore, defendant's confrontation rights were not violated. (*People v. Dungo*, *supra*, 55 Cal.4th at p. 621.)

Defendant recognizes that his case is controlled by *Dungo*, but argues the California Supreme Court's holding is erroneous. However, as defendant acknowledges, we are not at liberty to disregard our high court's pronouncement on this issue. (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Consequently, we reject his claim.

Even if we were to agree with defendant that the statements should have been excluded, we would find the admission of the evidence harmless. Erroneous admission of evidence in violation of a defendant's right to confront and cross-examine witnesses requires reversal unless the People can demonstrate beyond a reasonable doubt that the error was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661.) Defendant argues the "cause of death was a critical issue in the … case." He claims because there was evidence that the victim suffered from severe heart disease and because defendant claimed the victim was alive when he left the apartment, "it was critical to [defendant's] defense that he be permitted to confront and cross-examine the original pathologist concerning her observations of the

11.

condition of [the victim's] body and her conclusions regarding the cause of death." We disagree.

Initially we note the question presented at trial was not whether defendant caused the victim's death, but rather whether he killed the victim in self-defense. Defendant admitted he fought with the victim in a dispute over drugs. The defense argued it was the victim who attacked defendant. Indeed, defense counsel argued in closing that defendant "beat [the victim] up pretty good and ended up *causing his death*, but the issue in this case is what was reasonable on [defendant's] part, not just, you know, who had the worse injuries." (Italics added.) Defense counsel never mentioned causation as an issue during closing argument. Rather, he focused on whether defendant acted in self-defense and argued the facts supported self-defense rather than premeditation.

Furthermore, even if the victim's heart condition was a contributing factor to his death, it would not absolve defendant of liability for the victim's death as long as defendant's acts were a substantial factor contributing to his death. (*People v. Catlin* (2001) 26 Cal.4th 81, 155-156, overruled on other grounds in *People v. Nelson* (2008) 43 Cal.4th 1242, 1253-1256; *People v. Wattier* (1996) 51 Cal.App.4th 948, 953; *People v. Stamp* (1969) 2 Cal.App.3d 203, 210.) "A robber, for example, is guilty of felony murder if his victim is an obese person who dies of a heart attack within 20 minutes of a robbery." (*People v. Wattier*, *supra*, at p. 953.)

The evidence at trial established the victim sustained a violent beating. Several of his ribs were broken, he had blunt force trauma to the head and neck compression injuries consistent with strangulation. The bones in the victim's throat responsible for maintaining his airway were broken. The victim was found with his hands and feet bound to a bed frame, a scarf tied around his neck, and a mattress pulled over the top of his body. Defendant claimed the victim attacked him and had the stamina to fight with him for well over 20 minutes. Dr. Carpenter testified the victim's injuries could have been fatal even in a healthy person. Furthermore, in reaching its verdict the jury was

12.

required to find that defendant's actions were the cause of the victim's death. (CALCRIM No. 520.) As the evidence overwhelmingly established defendant's act of beating the victim caused his death, we conclude any error was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR


_____
POOCHIGIAN, Acting P.J.


_____
DETJEN, J.

13.